(No. 12246.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* E. T. SCOTT *et al.* Plaintiffs in Error.

*Opinion filed October 21, 1918.*

1. CRIMINAL LAW—*general rule as to admissibility of threats.* On a trial for murder, threats by the defendant to commit the crime are competent against him as showing intention, but an expression, to be admissible as a threat, must be of such a character or be made under such circumstances as to indicate a hostile purpose on the part of the speaker.

2. SAME—*what statement by accused is not admissible.* On the trial of a father and son for murder at a meeting of school directors to investigate alleged ill-treatment of other children of the father, a statement by the latter, two days before the meeting, that there was "going to be hell at the school house when that investigation took place," should not be admitted in evidence.

3. SAME—*when question asked of witness for the People is improper.* Where a sister of the deceased has testified to a threat by the defendant, and has stated, in answer to a leading question by defendant's counsel, that she would do anything she could to see the defendant convicted, a subsequent question by counsel for the People, "Now, you haven't any interest in this case other than to see the person punished who murdered your brother?" is improper, both as being leading and in using the word "murdered," and an objection thereto should be sustained.

4. SAME—*when the question as to an intention to act in self-defense should be allowed.* Where the defendant who did the shooting has testified in considerable detail as to the circumstances of the shooting, including the assault upon his father by the deceased, he should be allowed, as against a mere general objection, to answer the question, "You may tell the jury whether or not at any time you acted only what you believed in your father's defense or your own defense."

5. SAME—*instructions should not limit right of self-defense to actual danger.* On the trial of a father and son for murder, where the son shot the deceased after the latter had knocked the father down, instructions for the People are erroneous which state that the son had no right to shoot his father's assailant if the jury believed from the evidence that the blow struck by such assailant was not calculated to produce great bodily harm.

284 – 30

6. SAME—*a son has same right to defend his father as the latter has to defend himself.* A son has the same right to defend his father as the father has to defend himself, and if a person has made threats against the father in case he appears at a certain meeting the son has a right to defend his father in case of attack by the person making the threats, particularly where he had at another time given the father a severe beating.

7. SAME—*giving correct instructions does not cure error in giving inconsistent ones.* Error in giving instructions incorrectly limiting the right of self-defense to actual danger is not cured by the giving of other instructions correctly including such apparent danger as would govern a reasonably prudent man in the same situation.

WRIT OF ERROR to the Circuit Court of Hardin county; the Hon. CHARLES H. MILLER, Judge, presiding.

W. A. RITTENHOUSE, and JAMES A. WATSON, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, CLARENCE E. SOWARD, State's Attorney, and EDWARD C. FITCH, for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

At the March term, 1918, of the Hardin county circuit court, plaintiffs in error, E. T. Scott and Horatio Scott, were tried for the killing of Claude Ball at Tower Rock school house, in said county, on October 16, 1916. The jury returned a verdict finding E. T. Scott guilty of manslaughter and finding Horatio Scott guilty of murder, fixing his punishment at imprisonment in the penitentiary for twenty-five years. Motions for new trial and in arrest of judgment were overruled and judgment entered on the verdict as to both plaintiffs in error. They then sued out this writ of error.

E. T. Scott (called in the record Tom Scott) was president of the board of school directors of Tower Rock school district, a country district in said county. Horatio Scott (usually called in the record Ratio Scott) was his son. On

the day of the killing a meeting was being held in said school house to investigate some trouble that had arisen in the school between E. T. Scott's children and their teacher. Scott had invited the other two directors and the county superintendent of schools, Miss Hattie Rittenhouse, to be present at this hearing. The teacher was a lady named Mrs. Ethel Blakely. She seemed to have had some difficulty with her husband and at the time of the trial she called herself "Miss," apparently having been divorced or separated from her husband between the time she started to teach and the time of the trial. Scott's children insisted that the teacher had imposed upon them and had insulted them in reprimanding them for their conduct in school or as to not knowing their lessons. Scott became indignant over these charges and insisted on an investigation. The deceased, Claude Ball, a widower, was not a school director but had children who were pupils in the school. He was not invited by any of the directors or the county superintendent to attend the meeting but on the day of the hearing he appeared there, apparently as the champion of the teacher. The meeting was held at the school house on October 16, 1916, shortly after one o'clock. School had been in session that day and the children were present and most of them remained for the hearing. Tom Scott was a slight man in stature, weighing about 114 pounds, sixty-five years old at the time of the killing, and apparently of a very sensitive disposition and easily excited. The deceased was about thirty-five years old, weighing between 150 and 170 pounds, apparently strong and healthy. Horatio Scott was not in good health, as he was suffering from a double rupture and an abscess on his left arm. The deceased had lived for years a near neighbor to the Scotts and about three-quarters of a mile nearer the school house than did Tom Scott. Horatio, who was then twenty-three years of age, apparently lived on the same road on a farm between his father's home and that of the deceased. It appears from

the evidence that the deceased had had trouble with Tom Scott some years before and had given him a severe beating, but the difference between them had quieted down since then and they were apparently upon friendly terms. The deceased had made some efforts to prevent the meeting to investigate the trouble between Scott's children and the teacher, and in the forenoon of the day of the meeting, as the testimony for plaintiffs in error tends to show, he told Tom Scott if he (Scott) went to the school house that afternoon his family had better take a mule along to haul him home, and Scott testified that Ball at that time displayed a revolver and said to him that he would do witness worse than he did before. Ball also stated to one of the directors whom he was trying to persuade not to attend the meeting, that if old Tom (meaning Tom Scott) got to kicking around at the meeting he would knock him down. At the beginning of the interview between Tom Scott and Ball on the morning of the day of the trouble the county superintendent was present and heard part of the conversation but left before the talk ended. During this talk Tom Scott became excited over some question connected with the trouble and whipped one of his children who was present.

The school building is located not far from a country church and cemetery. Some of the people who were coming to the meeting met on the steps of this church before they went to the school house, Tom Scott among the number, and apparently his son, Horatio, was also there. Ball had been at the school house before that and came up to the church and had some conversation with Tom Scott. Both at the conversation in the morning between them and again later, Ball said somebody had been talking about the teacher in an improper way. His statements would lead to the conclusion that he thought someone had said that the teacher had been at his house too much and that their relations had not been proper. At both times this statement was made by Ball, Tom Scott said that he had nothing to do with that

kind of talk. After the talk in the morning Scott told his family what the deceased had threatened to do and talked with his son, Horatio, about it, and the son testified that on account of the trouble between his father and Ball and the threats made that morning he took his loaded revolver with him to the school house. As stated before, they met shortly after one o'clock in the school house. The building was a small frame one about twenty feet wide and thirty feet long and contained four rows of double seats, the stove standing in the middle of the room. When the three directors were all in the room, with Ball and Horatio Scott and two or three other grown people besides the teacher and school children, Tom Scott went to the teacher's desk, called the meeting to order and took charge of it, saying, in substance, that they all knew why they had met there; that he thought a great wrong had been done to his children and he wanted to see it righted; that if his children were in the wrong he would get a whip and horsewhip them. When he said this the teacher walked up towards him and remarked, "You might as well get your buggy whip." Scott resented this statement of the teacher's, and the testimony is in conflict as to just what he said and did. Some say that he doubled his fist and acted as if he intended to strike her. The testimony is to the effect that he told her to "shut up," and that Ball came from the back of the room and said to him, "You would not impose on a woman, would you?" There is testimony also to the effect that when Ball came up to Tom Scott, Horatio Scott followed not far behind but said nothing to Ball. The county superintendent of schools, Miss Hattie Rittenhouse, and one of the directors, J. M. Riley, told Ball and the teacher to go back and sit down; that they were going to settle the trouble quietly, and Horatio Scott advised his father to sit down and keep still. Ball and Horatio Scott both returned to the back part of the room and the teacher went to the northeast corner of the room to quiet some children who had become somewhat ex-

cited and were crying. Kate Scott, a daughter of Tom Scott, was then called on by him and told her story in regard to the trouble with the teacher. At the conclusion of her statement the county superintendent asked her if that was all she had to say, and she answered, "Yes." The teacher then left the corner of the room, came down the north aisle and said to the girl, "You had better go ahead and tell some more lies." Tom Scott then jumped up in the aisle and said to the county superintendent, "Miss Hattie, if you don't make her shut her mouth I will knock her down." The evidence does not agree as to how far the teacher was from Tom Scott at that time although all agree that there was at least a row of seats between them, and some of the testimony is that they were eight feet apart. There is some testimony, also, to the effect that Tom Scott doubled his fist. At about this time Ball came up behind Tom Scott and struck him behind the left ear, knocking him over and down between the seats. The weight of the evidence is that he struck rather than pushed him, and the evidence tends to show that there was a bruise on Scott's ear and blood on the ear and jaw.

Just after Horatio Scott had told his father that he ought to sit down and keep quiet and others had told Ball that he should go back and have the matter settled quietly, Tom Scott apparently quieted down but said to his son, "Ratio, be ready when the time comes." Immediately after Ball pushed or knocked Tom Scott down between the seats Horatio Scott came up behind Ball with a drawn revolver and began to fire at him. Ball apparently turned toward him and received one bullet in the corner of the mouth and another in his left breast, this being the fatal wound. He was also wounded in his hands. Ball and Horatio Scott engaged in a struggle; during which another revolver shot was fired and the revolver was knocked to the floor. The struggle continued until the cloak room was reached, at the east end of the building, when Ball sank to his knees and

died shortly after. There is some testimony on the part of the People that after some of the shots were fired Tom Scott took part in the struggle. There is also testimony on behalf of the defense by Horatio Scott and his sister that Ball about the time of the first shot, or a little before,—just after the father fell between the seats,—threw his hand to his hip pocket. Horatio Scott testified that he saw a revolver in Ball's hip pocket before they went into the school room and that he knew he had one there. There is testimony, also, by witness Shipp that Horatio asked him before they went into the school room if he had seen the butt end of a revolver in Ball's hip pocket, and witness replied in the negative. One of the coroner's jury (the inquest was held several hours after the killing) testified that he found a revolver in Ball's hip pocket at the time of the inquest, with a handkerchief over it, which made it quite hard to get the revolver out of the pocket.

We think the weight of the testimony tends to show that Tom Scott took no part in the physical struggle at the time of the shooting; that he was down between the seats until the third shot was fired, or about that time, and that when he got up he did not go near the other two men. He testified that when he said, "Ratio, be ready when the time comes," he meant to tell his son to be ready if Ball jumped on him; that Horatio should take him off. We find no testimony in the record to indicate that Tom Scott was the physical aggressor or attempted to approach the teacher or the deceased to provoke a controversy before the shooting. The evidence tends to show that the teacher on both occasions approached Tom Scott, and that the deceased approached Scott rather than that Scott approached him. The theory of the State on the trial was, and is here in the briefs, that the deceased, in trying to prevent the investigation, was striving to avert trouble in the school and was acting for the peace and good will of the community; that he pushed or struck Tom Scott to prevent his threatened assault upon

the teacher, and that the two plaintiffs in error went to the meeting expecting and prepared for trouble; that Tom Scott deliberately provoked Ball's attack and that the Scotts were the real aggressors. Counsel for plaintiffs in error contend that it is clear from the evidence that the teacher intended to provoke the excitable Tom Scott so that her·champion, Ball, could interfere; that the teacher and Ball were the intentional aggressors all the way through the trouble; that the plaintiffs in error never tried to start any quarrel with either of them; that at the time Tom Scott threatened to strike the teacher he was eight feet away from her, with a double row of seats between them; that no violence was attempted to be committed by anyone until after Tom Scott was struck· down by Ball, and that Horatio Scott did the shooting to defend his father from what he thought was extreme injury and to save his own life, fearing that Ball was about to draw his revolver, and thinking when he fired the first shot that it was his own life or Ball's that must end the struggle; that his actions were purely in self-defense; that the jury were misled by improper remarks by the court, the admission of improper evidence and the refusal to admit proper evidence on behalf of plaintiffs in error; that the court erred in the giving and refusing certain instructions; that the evidence is not sufficient to support the verdict of guilt as to Tom Scott as to any crime, and that if any crime was committed by Horatio Scott it could not have been any higher degree of homicide than manslaughter.

The evidence in the record as to just what took place at the crucial time of this homicide is sharply conflicting on ·certain points. Counsel for plaintiffs in error insist that the evidence for the State bearing most strongly against them comes from prejudiced witnesses, especially the evidence of director Riley and his children; that the evidence tends strongly to show that Riley had coached his children as to the story they were to tell, and that therefore their testimony is unreliable on certain crucial points, particularly as

to plaintiffs in error being the aggressors, as to whether Ball struck or pushed Tom Scott at the time he fell between the seats, and as to whether Ball made any motion towards his hip pocket just before the first shot was fired. We are not prepared to say that the record is of such a nature as to indicate that any witnesses, either for the State or the plaintiffs in error, have testified, knowingly and willfully, falsely. In a case of this kind some witnesses may have their testimony unconsciously colored because of their relations to the accused or the deceased. At the time of this trouble things were happening so rapidly that it is not at all strange that some of the eye-witnesses testified somewhat differently as to certain acts or statements of the participants. Furthermore, the witnesses were not all located at such points that they could all see equally well what was being done. The evidence was of such a nature that the rulings as to the admission and exclusion of evidence and the giving and refusing of instructions should have been accurate in order not to mislead the jury.

Counsel for plaintiffs in error argue that the court erred in admitting the statement of witness Marion Palmer that on Saturday, just before the Monday on which the killing occurred, Tom Scott stopped at witness' house on his way to town and a conversation arose with reference to the investigation that was to take place at the school house. After the question had been asked in several different ways by the State and objection sustained by the court, this question was finally asked of the witness by counsel for the State: "Well, in connection with that conversation in which you say that he said Claude Ball was taking sides with the teacher, I will ask you if he didn't say, and I ask permission of the court to refresh his recollection, 'There is going to be hell at the school house when that investigation took place.'" Over objection this question was allowed to be answered, and the witness answered by saying that that statement had been made by Tom Scott. After the witness had

been cross-examined at some length by counsel for plaintiffs in error on the subject of the conversation a motion was made to exclude the evidence, and the court overruled the motion, stating that the remark was not made towards the deceased, but "the evidence was admitted for whatever probative force it may have as to showing the condition of mind of plaintiff in error Tom Scott." It is most earnestly insisted by counsel for plaintiffs in error that not only was the evidence improper, but that this remark of the court was very prejudicial to plaintiffs in error, as indicating to the jury that the court believed that Tom Scott was excited and angry two days before the killing and that there was evidence showing he went to the school house on Monday for the purpose of taking Ball's life.

The general rule is that threats to commit the crime for which the accused is on trial are competent as evidence against him upon the question whether he in fact committed it, as showing intention. An expression, to be admissible as a threat, must be of such character or made under such circumstances as to indicate a hostile purpose on the part of the speaker. The language used, or the circumstances under which used, must be broad enough to include the injured person within its terms, but threats, even against third persons, may be admissible where the connection between them and the deceased is such that under certain circumstances the threats would import harm to or hostility toward the deceased. (13 R. C. L. 924; 6 Ency. of Evidence, 710.) The general rule also is, that a threat by the accused to kill or injure a person other than the deceased, or a mere idle threat of a general nature not directed to any particular person, is not admissible to show malice towards the deceased. (21 Cyc. 891.) On this point, in *Bird* v. *United States,* 180 U. S. 356, the court, in discussing this question, said (p. 360) : "The particular violence threatened was not against the deceased but against another member of the party," and it was held that under the circumstances

in that case the evidence of the threat was wrongly admitted. "To make threats admissible there must be some kind of individuation, showing that the person injured was in some sense within the scope of the threats." (2 Wharton on Crim. Evidence,—10th ed.—1504.) In *Palmer* v. *People,* 138 Ill. 356, it was testified that the accused, two days before the homicide, on passing one N., who had been a constable, had remarked to the witness, "N. aims to arrest me;" that the accused then drew a revolver from his pocket, saying, "If he tries to arrest me he will hear from this." It was held in that case that the statements of the accused were proper evidence as tending to show general malice against any officer who might attempt to arrest him, and, taken in connection with his exhibition of a deadly weapon, showed his animus and tended to show a resistance to the arrest he expected. This evidence did not tend to support the issues involved in this case and should not have been admitted.

In this connection it is appropriate to discuss the refusal of the trial court to give an instruction asked by plaintiffs in error to the effect that the verbal statements of a defendant should be received by the jury with great caution, as that kind of evidence is subject to imperfection and mistake; that the defendant may have been misinformed or may not have clearly expressed his meaning or the witness may have misunderstood him, and it sometimes happens that a witness, by unintentionally altering a few of the expressions really used, gives an effect to the statements of a defendant completely at variance with what the defendant did actually say, but it is the province of the jury to weigh such evidence and to give it the consideration to which it is entitled, in the light of all the other evidence in the case. This instruction was properly refused by the court.

Counsel for plaintiffs in error further argue that the court erred in permitting Elsie Burris to answer an improper question. She was a sister of the deceased, living with her husband a short distance from Ball. She testi-

fied that she visited Tom Scott's house on the morning before the killing, and that in her presence he said there was trouble between the teacher and his girls and that Ball had taken the part of the teacher; that he was going to have the trouble settled if somebody's life was lost. On cross-examination she stated, in answer to a leading question by counsel for plaintiffs in error, that she would do anything she could to see plaintiffs in error convicted. On re-direct examination counsel for the People asked her, "Now, you haven't any interest in this case other than to see the person punished who murdered your brother?" This question was objected to and the objection was overruled, and she answered, "This is all the interest I have." It is argued by counsel for plaintiffs in error that the fact that the court allowed this question to be asked and answered in that form would certainly lead the jury to believe that the trial judge believed that those doing the killing were guilty of murder. Counsel for the State concede in their argument that the word "murdered" should not have been used in this question, but insist that the general rule is that an objection to the admission of evidence must be specific; (*Chicago and Eastern Illinois Railroad Co.* v. *Wallace,* 202 Ill. 129; *Stone* v. *Great Western Oil Co.* 41 id. 85;) that if the objection to the use of the word "murdered" had been made by counsel for plaintiffs in error the form of the question could have been changed. Not having made that specific objection on the trial below counsel argue it cannot be made here. The objection to this question should have been sustained.

Counsel for plaintiffs in error further earnestly argue that the court erred in refusing to allow plaintiff in error Horatio Scott to answer a certain question as to whether his acts were done, as he believed, in his father's or in his own defense. To understand better the nature of this question it may be well to state, briefly, the substance of Horatio Scott's testimony before the question was asked him. After stating that he saw Ball start towards his father with his fist

drawn to strike him, and that witness was close to Ball, he continued: "I was intending to protect my father. When I got near Claude he turned and wheeled towards me. He throwed his right hand in his hip pocket. He turned as quick as he could. I thought it was my life or his. I don't know how many shots I fired. I fired as fast as I could. He grabbed my right hand with his left and kinda went down on one knee. He throwed his right hand toward his hip pocket again. He kept trying to get my gun and his and I kept trying to keep him from it until it was discharged. I don't know what direction the last ball went. We were both struggling for the revolver and it was knocked out of my hand pretty soon. He got on his feet then and tried to get his gun. I tried to keep him from it. I got him by the throat with the right hand. He caught me by the right wrist. He kept backing until we got in the cloak room. He kicked at me three or four times and tried to get his hand, and I held his hand until he sank down. I turned immediately and walked out. I didn't have any ill-feeling against him or any desire to kill him." Then the following question was put to him by his counsel: "You may tell the jury whether or not at any time you acted only what you believed in your father's defense or your own defense." Counsel for the People made a general objection to the question, and the objection was sustained by the court. It is now argued that the court erred in refusing to allow this question to be answered.

Counsel for the State argue that the objection was properly sustained because the question was leading. No such suggestion was made at the time the question was asked—simply a general objection—and the general objection was sustained. It is also insisted by counsel for the State that the question was not in proper form in other respects; that the question should have been, in substance, whether he believed he was acting in defense of his life or his father's life or defense against great bodily harm to one of them;

that the question as asked would include a defense as to any
trivial injury against either of them. There would be much
force in this last argument if that specific objection had
been made at the time the question was asked. In *Wallace*
v. *United States,* 162 U. S. 466, the court said: "It has
often been decided that where the intent is a material ques-
tion the accused may testify in his own behalf as to what
his intent was in doing the act. * * * Granting that the
jury would have been justified in finding that Wallace's in-
tention in going for the gun and returning with it as he
did was to inflict bodily harm on Zane if he did not leave,
still the presumption was not an irrebuttable one, and it was
for the jury to say whether Wallace's statement that he pro-
cured the gun only for self-protection was or was not true,
and if they believed from the evidence that this was true
and that the killing was under reasonable apprehension of
imminent peril, then it was for the jury to determine, under
all the facts and circumstances, whether Wallace had com-
mitted the offense of manslaughter rather than that of mur-
der, if he could not be excused altogether." This court in
*Wohlford* v. *People,* 148 Ill. 296, quoted with approval from
*Thurston* v. *Cornell,* 38 N. Y. 281, the following: "The
law is now well settled, under the rule admitting parties to
testify in their own behalf, that where the character of the
action depends upon the intent of the party, it is competent,
when that party is a witness, to inquire of him what his
intention was." (See to the same effect, 4 Elliott on Evi-
dence, sec. 3041; *Los Angeles* v. *McCollum,* 23 L. R. A.
(N. S.) 378, and cases cited in note on page 388.) It is
practically conceded by counsel for the State that the ques-
tion was proper but they contend that it was harmless error
to refuse to allow it to be answered because the witness
answered other questions which covered the same ground.
We have read the record as to this argument and do not
concur that the substance of this question was practically
covered by the other answers. While the question would

have been in better form if it had been so worded as to cover "defense of himself or his father from severe or fatal bodily injury," we think it was error to sustain the objection to it in the form that it was asked, although if the specific objection now raised to it had been raised at that time the proper practice would have been for counsel for plaintiffs in error to change their question so as to obviate the objection.

Counsel for plaintiffs in error further argue that instructions 45 and 46 given for the People were erroneous. These instructions stated at length and in some detail that if the jury believed from the evidence, beyond a reasonable doubt, that the blow given to defendant Tom Scott by the deceased was not calculated to produce great bodily harm, then and in that case defendant Horatio Scott had no right to assault the deceased with a deadly weapon. It is argued by counsel for plaintiffs in error that these instructions in effect told the jury that if they believed the blow given Tom Scott was not calculated to produce great bodily harm, then the defendant Horatio Scott had no right to assault the deceased with a deadly weapon; that they permitted the jury to determine this fact in the light of all the evidence in the case, when they could coolly pass upon the evidence introduced; that they took away from Horatio Scott the right to judge from appearances as they existed at the time of the killing whether he or his father was in danger of great bodily harm from Ball at the time Horatio Scott fired the shots. There can be no question, under repeated holdings of this court, that actual and positive danger is not indispensable to justify self-defense. If one is pursued or assaulted in such a way as to induce in him a reasonable and well founded belief that he is actually in danger of losing his life or of receiving great bodily harm, under the influence of such apprehension he will be justified in defending himself whether the danger is real or only apparent. A man, when threatened with danger, must determine from

appearances and the actual state of things surrounding him as to the necessity of resorting to self-defense, and if he acts from reasonable and honest convictions he will not be held responsible criminally for a mistake as to the extent of the actual danger, where other judicious men would have been alike mistaken. *Campbell* v. *People,* 16 Ill. 17; *Enright* v. *People,* 155 id. 32; *People* v. *McGinnis,* 234 id. 68; *People* v. *Jones,* 241 id. 482; *People* v. *Simpson,* 270 id. 540; *People* v*. Sinnot,* 274 id. 184.

Counsel for the State agree that if the construction urged by counsel for plaintiffs in error be the proper one to be placed upon these instructions both were erroneous. There is merit in the argument of counsel for plaintiffs in error that such construction might have been placed on these instructions by the jury. Counsel for the State further argue that if such construction could be placed upon these instructions they would have still been harmless because of the other instructions that were given both for the People and plaintiffs in error, which set out the rule of law on this question correctly; that even though instructions 45 and 46, standing alone, might have made the jury consider themselves justified in finding plaintiffs in error guilty if the jury themselves considered that there was actually no danger of loss of life or of great bodily injury, and that the killing was unnecessary, irrespective of what Horatio Scott believed at the time he fired the shots, still these instructions were not prejudicial because they did not stand alone; that in no less than seven different instructions the jury were instructed that the accused had the right to act upon the appearance of danger and upon his belief of what was necessary to save himself or another from death or great bodily harm, even though such danger was not real but only apparent. This court held in *Enright* v. *People, supra,* that an instruction which limits the right of self-defense in the prosecution of murder to actual danger is not rendered harmless by giving, at the request of the accused, instruc-

tions stating the law correctly, and the rule as laid down by this court is to the effect that when two inconsistent instructions are given to the jury on the same subject, one laying down the law correctly will not cure an error in the other instruction stating it incorrectly, for the jury might be easily misled as to what the law was, not knowing which instruction to follow. (*People* v. *Novick,* 265 Ill. 436; *People* v. *Dettmering,* 278 id. 580.) The giving of these instructions, worded as they were, was prejudicial to plaintiffs in error.

Counsel for plaintiffs in error argue that the court erred in giving instruction 23 for the People, insisting that it assumes that plaintiffs in error were the assailants, and that it is objectionable for the same reason that somewhat similar instructions were held objectionable in *Filippo* v. *People,* 224 Ill. 212, and *Foglia* v. *People,* 229 id. 286. On the record as it is before us here we think that instructions which assumed that plaintiffs in error were the assailants would be misleading and should not be given, although it is insisted by counsel for the State that the evidence tends to show that plaintiffs in error were the assailants, in that Tom Scott was starting to assault the teacher and that Ball interfered and struck him to prevent that assault. We think this theory of the State is not borne out by the record. Even if the record does tend to show that Tom Scott was doubling his fist and had said to the county superintendent, "If you don't make her shut her mouth I'll knock her down," we think the evidence shows that Tom Scott was not at that time where he could have enforced his threat immediately, or in a position that would justify the deceased, in defense of the teacher's safety, in knocking him down. While we think this instruction was misleading in the regard insisted upon, we do not think it is so misleading as to justify a reversal on this ground, alone. However, we think the instruction could have been worded differently, so as not to assume that plaintiffs in error were the original assailants.

Counsel for plaintiffs in error further argue that the instructions given for the People as to explaining the meaning of the phrase "reasonable doubt" were misleading in the same way that similar instructions were misleading which were criticised in *People* v. *Wallace,* 279 Ill. 139. This court has repeatedly criticised the giving of numerous instructions on the question of reasonable doubt. (*Cunningham* v. *People,* 210 Ill. 410; *People* v. *Warren,* 259 id. 213; *People* v. *Wallace, supra; People* v. *Snyder,* 279 Ill. 435; also see on this subject the reasoning in *Johnson* v. *People,* 202 Ill. 53, and the cases there cited.) Under the doctrine laid down in these decisions the giving of numerous and complicated instructions on reasonable doubt is apt to be misleading rather than helpful to the jury and therefore the giving of them should ·be condemned, but we are of the opinion that they were not so misleading in this case as to require a reversal on that ground, alone.

Certain other instructions are criticised, but the defects, if any, are not of such character as to justify an extended consideration here.

We have now discussed all the serious questions raised by counsel in their briefs as to the errors complained of. It is practically conceded by counsel for the State that errors were committed, but it is argued that they were not of such nature that this verdict ought to be set aside because of them. (*People* v. *McCann,* 247 Ill. 130; *People* v. *Cleminson,* 250 id. 135; *People* v. *Murphy,* 276 id. 304; *People* v. *Halpin,* 276 id. 363; *People* v. *O'Brien,* 277 id. 305.) It is true that this court has often laid down the rule, in accordance with the reasoning of the opinions just cited, that errors will not always reverse ·in a criminal case where the evidence is of such a nature as to cause the court to believe that the jury, acting on reasonably competent evidence and under proper rulings and instructions, could have reached no other conclusion than that of the guilt of the accused; that a judgment ought not to be reversed for such

errors in order that a better record free from these errors could be made in another trial. The difficulty, of course, comes in applying this general rule to the particular facts of the individual case. There can be no question, when the evidence on material points at issue is conflicting, that the instructions or rulings as to the law should apply the law applicable to the facts with accuracy. In a case of this kind, growing out of a dispute that caused the calling of the meeting of the directors at the school house, beyond question much feeling must have been aroused in the neighborhood, and different witnesses were liable to become, in a measure, unconsciously partisan with reference to their testimony. The evidence, as already stated, was sharply conflicting upon some of the material questions as to who were the aggressors in the conflict in the school house and whether there was any ground in the evidence to justify Horatio Scott in shooting Ball. The jury evidently did not believe that there was any premeditated design on the part of Tom Scott to take the life of the deceased or that he had gone to the school house that afternoon with that purpose in mind or the verdict against him would have been for murder instead of manslaughter. The law is that Horatio Scott had the same right to defend his father as his father would have had to defend himself. (*People* v. *Forte*, 269 Ill. 505.) It is clear, also, that the law of self-defense, in view of the threats that the evidence tends to show had been made against the father by Ball and in the light of the fact that Ball had severely beaten the elder Scott some years before, would justify Horatio Scott in trying to defend his father. (See *Adams* v. *People*, 47 Ill. 376, and the reasoning of the authorities cited in *Wallace* v. *United States, supra.*) This being so, and the evidence of the guilt of both plaintiffs in error on the points at issue being so close and in such conflict, it cannot be said that the giving of some of the instructions already discussed on the question of self-defense were not of such a misleading character as to have

prejudiced the jury. Taken in connection with the other errors heretofore considered, we think the plaintiffs in error did not have such a fair and impartial trial as to justify this court in affirming the judgment.

The judgment of the circuit court will therefore be reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*