THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
RALPH J. NAU, Defendant-Appellee.

Second District   No. 2—86—1027

Opinion filed March 11, 1988.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Lori J. Miller, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Francine Harrison, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE HOPF delivered the opinion of the court:

Defendant, Ralph Nau, was arrested on August 9, 1984, and charged by indictment with the murder of his stepbrother. After being found unfit to stand trial on two separate occasions, defendant filed, among other things, a motion to suppress his inculpatory statements. The State appeals from the trial court order granting defendant's motion and asserts that the order was contrary to the manifest weight of the evidence. We affirm the trial court.

Defendant lived on an egg farm with his mother and stepfather, Shirley and Ken Gerken, and Dennis Gerken, Ken's son from a prior marriage. Dennis was eight years old but was unable to speak or perform basic functions, such as dressing and undressing or going to the bathroom, by himself. On the evening of August 8, 1984, defendant was in the living room of the family home watching the Olympics on television. Around 8:30 p.m. Shirley undressed Dennis and put him to bed. Later, Shirley, Ken, and Shirley's parents, who were visiting the Gerkens, were watching television in the family room. At approximately 10 p.m., defendant came into the room and said he had heard Dennis crying or making some noise and had gone to check Dennis' room but Dennis was not there. The family looked for the child for about half an hour and then called the Lake County sheriff's department. Around 4:30 the next morning, August 9, 1984, officers from the sheriff's department, acting in response to information provided by defendant, found a fresh gravesite containing Dennis' body. Defendant was arrested and ultimately charged with the murder of Dennis Gerken. Defendant was 29 years old at the time.

During defendant's bond hearing, the State moved for an examination to determine whether defendant was fit to stand trial. The fitness hearing was held on January 16, 1985. Dr. Leo Goldman, a psychiatrist, testified on defendant's behalf that on the basis of interviews with defendant in August 1984 and November 1984, interviews with defendant's mother, and review of police reports, he had initially formed the opinion that defendant was fit to stand trial. However, when the doctor attempted to interview him again in December, defendant walked away and refused to talk. Dr. Goldman indicated

that defendant had regressed since he had been in custody and opined that he was not then fit to stand trial.

Joseph Pribyl, a clinical psychologist, also testified for the defense. He had interviewed defendant four times between September 7, 1984, and November 2, 1984, administered various tests, spoken with the court-appointed examiners and defendant's attorney, and reviewed police reports. Pribyl concluded that defendant was marginally fit to stand trial as of the November interview. However, after another interview on January 8, 1985, Pribyl changed his opinion. The psychologist noted that defendant had deteriorated since the November meeting and diagnosed him as schizophrenic, paranoid type. He was of the opinion that defendant was unfit to stand trial.

The parties stipulated to the testimony of Dr. Ronald Baron, a psychiatrist. Dr. Baron had interviewed defendant three times between August 20, 1984, and December 19, 1984. He indicated that defendant's thought content revealed bizarre and psychotic thinking and diagnosed his problem as chronic paranoid psychosis. Dr. Baron concluded that defendant was unfit for trial.

Dr. Werner Tuteur, also a psychiatrist, testified for the State. He had met with defendant one time, on November 12, 1984, for over two hours, reviewed police reports and talked to the State's Attorney. Tuteur diagnosed defendant as suffering from schizophrenia, paranoid type and added that he was psychotic. He maintained, however, that at the time of the interview defendant was fit to stand trial.

All of the experts who testified at his first fitness hearing indicated that defendant suffered from delusions of grandeur and delusions of persecution. The witnesses described numerous bizarre experiences that defendant had related to them, including his perceptions that the government was out to get him and that his lawyers were trying to keep him in jail. Without exception the witnesses testified that defendant had told them of his many involvements with numerous movie stars and well-known singers such as Olivia Newton-John, Cher, Sheena Easton, and Catherine Deneuve. The testimony also showed that defendant had actually made several trips to foreign countries in the belief that he would meet and be with certain of these celebrities who loved him and wanted him to be with them. The trial court found defendant unfit to stand trial and remanded him to the Department of Mental Health and Developmental Disabilities (DMH).

On January 29, 1986, the State moved for a second fitness hearing, but the motion was denied. The State moved for reconsideration of the denial. This time the motion was granted and a fitness hearing was held on June 18, 1986.

Dr. Vallabhaneni, a psychiatrist from Chester Mental Health Center, testified that he had observed or had contact with defendant on almost a daily basis since the middle of February 1985. Based on this contact, the doctor opined that defendant understood the functions of his lawyer, the court, and the judge, as well as the nature of the charges against him. He also stated, however, that defendant had a major psychiatric illness, generally called psychosis, with symptoms which included delusions and possible hallucinations. While he could not state with certainty that defendant was or was not a malingerer, Vallabhaneni concluded that defendant had not responded to treatment sufficiently to be fit to stand trial.

Another psychiatrist from Chester Mental Health Center, Dr. Basil Sklan, had seen defendant periodically between February 1985 and October 1985, but saw him weekly and sat down with him monthly for treatment plan meetings after October. The doctor diagnosed defendant's ailment as schizophrenia with active psychosis and indicated that fantasies and delusions were part of defendant's schizophrenia. Defendant had related fantasies about God as well as various celebrities. Sklan did not think defendant was malingering and did not believe his fantasies were voluntary. Rather, the doctor's testimony reflected his conclusion that, although defendant understood the functions of the various court personnel, his illness prevented him from cooperating with his attorneys. When asked, the witness responded that defendant had been unfit to stand trial the preceding February and was still unfit.

The trial court again found defendant unfit and remanded him to DMH. Defendant then filed a motion to suppress his inculpatory statements. At a hearing on the motion the State presented testimony from numerous witnesses.

Sergeant Iwan of the Lake County sheriff's department testified to his interviews with defendant late in the evening of August 8 and in the early morning hours of August 9. While sitting with defendant in Deputy Mustell's squad car, before the victim was found, Iwan asked if defendant had any clues about the victim's disappearance. Defendant told about a dream he had had involving the drowning of Olivia Newton-John and discussed the Olympics and the Romanian gymnastics team. He told the officers that the team wanted him to be with them and that Nadia Comaneci loved him. He explained that he got these messages over the television. Defendant then went with the officers to the sheriff's department.

Defendant was given the *Miranda* warnings and, when asked, indicated he understood them. Iwan then asked defendant if he wished

to speak to him about Dennis Gerken. Defendant said he did. The sergeant also handed defendant the form containing the *Miranda* warnings and asked defendant to read it and if he understood. Defendant responded affirmatively. Finally, Iwan advised defendant that, if he wished to speak voluntarily, he should sign the form. Defendant signed it.

Sometime later, during the interview, Iwan asked defendant if he had any clues as to where Dennis was. Defendant responded by talking about the burial site of one dog, near a lone tree in the cornfield west of the barn, and the play area of a second dog in the egg coolers. Iwan ordered a search of those areas, which led to the discovery of the victim's gravesite about an hour later. The sergeant left for the scene where the victim was found, and no more questions were asked of defendant at that time.

Dennis Gerken's body was found near a lone tree adjacent to the cornfield, east of the barn. A towel with red stains and defendant's boots, which were very clean, were seized from the basement of the Gerken home.

Sergeant Iwan, along with Assistant State's Attorney Chancey, questioned defendant again at approximately 8 o'clock that morning. Defendant was again read the *Miranda* warnings. He was also told that a body had been found at the gravesite he had described. When Chancey tried to discuss his background, defendant talked about Olivia Newton-John and the Romanian gymnastics team. At some point, he stated that he remembered hitting something with an axe. According to Iwan's testimony defendant then related that he went to Dennis' room, helped the boy dress, and took him out of the house and behind the barns. Defendant took an axe from the feed bin and a shovel was at the grave. While he was walking with Dennis, the child turned into an animal. When the animal tried to get away he struck it with the axe several times and buried it. He replaced the axe and threw the shovel inside the feed bin. Defendant said he then went back to the house, washed his clothes, cleaned his boots, and went to the living room to watch the Olympics on television. Iwan testified that defendant was crying and emotionally drained after completing his statement. Defendant neither told his questioners that he did not want to talk nor asked for an attorney. In Iwan's opinion the defendant was sane when he made his statement.

Cross-examination revealed that Iwan had noted in his written report that defendant had drifted between fantasy and reality. The officer had also referred to hallucinations by defendant about Olivia Newton-John.

Deputy Mustell's testimony was essentially the same as Iwan's concerning the first interview with defendant. He added only that, after Iwan left to go back to the Gerken farm, defendant talked some more about his friendship with Olivia Newton-John and the messages he received over TV.

Assistant State's Attorney Chancey's testimony was substantially corroborative of that given by Sergeant Iwan regarding the second interview with defendant. Chancey noted defendant's willingness to talk even after being given *Miranda* warnings and defendant's relation of his numerous fantasies. The witness indicated also, however, that defendant said he had not heard voices, received messages from the TV, or blacked out on the night Dennis was killed. Chancey related a version of defendant's incriminating statement that was very similar in all respects to that given by Iwan. The assistant State's Attorney observed that defendant hung his head and lowered his voice when he spoke or answered questions about the victim. Like Iwan, Chancey mentioned that defendant began to cry at the end of his statement.

In Chancey's opinion defendant was sane when he gave his statement. The witness based his opinion on a number of different factors which he delineated for the court. First of all, when he was interviewed defendant appeared to understand everything that was said to him. He had given responsive answers and had not rambled. Also, defendant had taken steps to conceal the crime, thus indicating to Chancey an awareness that he had done something wrong. In this regard Chancey pointed out that defendant took Dennis away from the light so that they could not be seen, referred to Dennis as an animal, concealed the shovel, and cleaned his shoes and clothes. The witness also stated that he thought defendant exhibited remorse when he hung his head, lowered his voice, and cried during his statement. Chancey found it significant that defendant had not heard voices or received any messages the night Dennis was killed. Finally, Chancey noted that the celebrity fantasies defendant had expressed were not related to what happened to Dennis.

On cross-examination Chancey acknowledged that it was he who requested a competency hearing for defendant at the time of defendant's bond hearing. However, it was his opinion that defendant's fantasies were not the cause of what he did to Dennis. When asked if he believed defendant's feelings or thoughts about the female celebrities showed some mental illness, Chancey responded: "There is no question about it in my mind, that there is some mental illness there."

Shirley Gerken testified that defendant had been a loner as a child and in early childhood had taken medication for involuntary body

movements. In recent years defendant had traveled to Scotland believing he would meet Sheena Easton and twice had traveled to Australia to meet Olivia Newton-John. During his last trip to Australia his parents were contacted by the State Department because defendant had been found wandering around a Salvation Army compound. He had neither a work visa for Australia nor a return ticket to the United States. Prior to one of his trips defendant had sold his car to a stranger in a McDonald's parking lot for $1. However, defendant was dependable and a good worker. He had consistently taken care of his personal needs, done his own laundry, and helped to care for Dennis. Defendant's mother was aware of his fantasies and was troubled by them. She had asked him, unsuccessfully, to seek help.

Ken Gerken indicated that defendant was faithful and industrious in performing his regular chores on the farm. Early in the evening of Dennis' death Ken had asked defendant to keep the louvered doors to the living room open for ventilation purposes. Defendant responded that Dennis was in the other part of the house and he, defendant, did not want to be bothered when he was watching the Olympics. On cross-examination the witness indicated he only knew about defendant's bizarre behavior from hearsay; defendant never spoke to him about his fantasies or acted delusional when he was working on the farm.

Dr. Leo Goldman testified on behalf of defendant. Much of his testimony was the same as he had given at defendant's first fitness hearing. However, since that hearing he had read a number of letters written by defendant which merely confirmed his opinion that defendant was insane on August 8 and 9, 1984, including the moments when he waived his *Miranda* rights. The doctor indicated that defendant had some memory of Dennis' death which he "records as if it were a dream or that it was a dream." The witness also reported defendant's statement that he could not be tried for having a dream. Dr. Goldman explained his earlier change of opinion regarding defendant's fitness to stand trial on the basis that he may not have fully understood defendant's belief that he could not be tried since he merely dreamed Dennis' death and had not actually committed a crime. If he had been aware of that belief at the earliest interview with defendant he would have found him unfit at that time. Dr. Goldman also testified that it would not be unusual for an insane person to act normal in many aspects of his life and that schizophrenics can be sane at times and insane at other times. However, according to the witness, defendant was psychotic at the time of the offense in that he could not discern reality from delusions. Dr. Goldman affirmed that if a person's crimi-

nal act is unrelated to his delusions, it is more likely the person was sane when he committed the criminal act. He added that when the act and delusion are unrelated, it is even more likely the person was sane at the time of the act if motivation for the act can be found.

Dr. Joseph Pribyl also testified again for defendant. Much of his testimony also was reflective of testimony he had given at defendant's first fitness hearing. Pribyl indicated that defendant was suffering from schizophrenia on August 8 and 9 despite his ability to answer questions and converse. Like Dr. Goldman, Pribyl related that defendant had described the subject events as a dream. He characterized defendant's perception that Dennis was a dog as an hallucination. Pribyl concluded that at the time he was interviewed by police, defendant was occupied with delusions to the point that his conversation with the officers was of little importance to him. Defendant's delusional system was so strong at that time that it interfered with his ability to make a decision as to whether or not a waiver of his rights was in his best interests. Moreover, according to the witness, defendant's judgment could not be trusted to make a sound decision on important matters.

Pribyl did not view defendant's conduct in cleaning his boots and clothing as concealment since he perceived defendant as a person who would routinely clean up after himself. Nor, in Pribyl's opinion, was defendant malingering at the time the doctor interviewed him because defendant's interpersonal skills were too limited to be able to carry out such a ploy. In the doctor's words: "It would be very, very apparent if he were attempting to dupe me or fool me."

At the close of evidence the parties asked the court to take judicial notice of the court file and specifically mentioned the reports filed every 90 days while defendant was at Chester Mental Health Center, including Dr. Vallabhaneni's and Dr. Sklan's reports.

The trial court granted the motion to suppress on grounds that the State had not shown by a preponderance of the evidence that defendant had waived his rights in a meaningful and knowing manner prior to making inculpatory statements. The report of proceedings indicates that the court set forth the reasoning behind its decision in considerable detail. First, the judge focused on defendant's letters. He found that the letters began to reflect defendant's fantasies about various celebrities in mid-1980 and became increasingly delusional with the passage of time, reaching a peak in July 1984. Numerous details of the letters were cited by the judge to demonstrate that the delusions were beginning to encompass defendant's mind. The court also mentioned several incidents involving defendant which revealed

that his delusions were active.

Reference was made by the trial judge to both the professional psychiatric opinions he had heard and the opinions given by Sergeant Iwan and Assistant State's Attorney Chancey. The extensive professional backgrounds of the latter two witnesses were specifically acknowledged. The judge indicated, however, that even when defendant was being questioned by Iwan and Chancey, although some of his answers were appropriate, his delusions manifested themselves.

The lower court concluded that defendant's delusions played a part in the operation of his actions. As expressed by the judge: "The delusions and the reality are on a common track, at least at this point in time." According to the court, even though he did exhibit some rationality, defendant was not sane when the *Miranda* warnings were given and could not have knowingly and meaningfully waived his rights. Consequently, the State had not met its burden, and the motion to suppress was granted. The State's subsequent motion to reconsider was denied, and this appeal was timely and properly filed.

The State contends that the suppression order was erroneous because it was contrary to the manifest weight of the evidence. In support of its contention, the State argues that certain evidence was either not considered or not given proper weight by the trial court. This argument is not supported by the record.

■ The issue at the suppression hearing was whether defendant had waived his rights after he was given the *Miranda* warnings. Whether a valid waiver has been given depends on whether the accused in fact knowingly and voluntarily waived those rights. (*People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132, 476 N.E.2d 1179.) To determine whether a waiver is knowing and intelligent, the facts and circumstances of each case must be considered (*People v. Ellison* (1984), 126 Ill. App. 3d 985, 992, 466 N.E.2d 1024) as well as those characteristics of the accused which bear upon his ability to make knowledgeable and independent decisions. (*Racanelli*, 132 Ill. App. 3d at 132.) The trial court's ruling following a hearing on a motion to suppress will be disturbed by a reviewing court only if it is against the manifest weight of the evidence. (*Ellison*, 126 Ill. App. 3d at 992.) We are persuaded that the trial court's ruling should not be disturbed.

There is little dispute that defendant suffered from mental illness, as evidenced by Assistant State's Attorney Chancey's request for a fitness determination at defendant's bond hearing, as well as his later statement that he had no doubts as to defendant's disability. The record itself is replete with evidence of defendant's affliction. The issue is whether defendant was sane or insane *at the time* he told Iwan and

Chancey that he understood the *Miranda* warnings and made his incriminating statement. The State, focusing heavily on the opinion expressed by both Iwan and Chancey that defendant was sane at the relevant time, stresses that these two witnesses were with defendant shortly after the crime, observed him at the time he gave the statement, and had the background and experience to make a reliable statement regarding his sanity. Their testimony, the State argues, was not given the weight it deserved. The record shows otherwise.

■ The trial judge specifically mentioned Iwan and Chancey, noted that they had extensive experience, and expressly acknowledged that their opinions were based on what they observed at the time they were interviewing defendant. The judge even noted that defendant gave them some appropriate answers. It is difficult to see what more the court could have done to show that it gave ample weight to the witnesses' testimony. We recognize that the officers' opinions differ from the opinions given by defendant's experts. However, where the evidence merely conflicts, it is for the trial court to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence, and a reviewing court will not substitute its judgment for that of the trier of fact. *Racanelli*, 132 Ill. App. 3d at 129.

The State urges that the various reasons given by Chancey for his opinion of defendant's sanity are, in themselves, evidence that defendant was sane. However, even if the facts cited by Chancey did qualify as evidence, they constituted only one part of the total body of evidence offered for the court's consideration and must be weighed within that context. Chancey stressed what he called defendant's acts of concealment. Psychologist Pribyl merely said that those acts were consistent with a person who habitually cleaned up after himself. While Chancey focused on defendant's responsiveness, he also testified that the interview was liberally sprinkled with defendant's talk about his delusions. Both Dr. Goldman and Joseph Pribyl indicated that a person in defendant's mental condition would be able to be responsive to some extent. Finally, although we agree with Chancey's observations that defendant's fantasies about celebrities did not appear to be related to the tragic death of Dennis Gerken, his fantasy or delusion that he had killed a dog certainly was so related. In sum, the meaning of the facts Chancey relied on was not altogether clear or uncontradicted.

The State challenges the testimony of defendant's experts regarding his mental state at the time of the waiver on grounds that their opinions conflict with their initial determinations that defendant was

fit to stand trial. It is the State's position that knowledge for purposes of a *Miranda* waiver is no more demanding than knowledge in the fitness context. We find that we need not address the issue raised by the State since testimony given by both experts indicates that their two findings are not necessarily as far apart as they might seem.

To begin with, Dr. Goldman indicated at the suppression hearing that if he had initially known of defendant's belief that he had only dreamed of Dennis' death, he would have found defendant unfit for trial at the time of his earliest interview with him. Thus it appears Dr. Goldman's initial fitness finding may have been based on incomplete information. Furthermore, Dr. Goldman claimed that after his very first interview with defendant he had formed the opinion that defendant was insane and this opinion had never changed. However, the doctor explained that in light of the ability of an insane person to perform normal tasks in other areas, he believed defendant sufficiently understood the court process to be found fit. The doctor had not included his opinion regarding defendant's sanity in a report prepared by him in August 1984. He had, rather, diagnosed defendant as a schizophrenic. The witness added that, after reviewing defendant's letters, he thought defendant had been insane since 1979 or 1980.

With regard to the opinions of Joseph Pribyl, we note that even at the outset the witness found defendant only marginally fit to stand trial. Also, like Dr. Goldman, Pribyl testified that defendant could have performed mundane tasks and was, in fact, often responsive and able to converse during his interviews, despite his insanity. It seems possible that defendant could grasp certain trial-related information and still be unable to make proper judgments regarding his own best interests. All in all, that the psychiatric experts found defendant fit for trial but unable to make a knowing waiver is not as persuasive of defendant's sanity as it appears to be at first glance.

In addition to the evidence we have already discussed, the trial court had before it a series of letters written by defendant. We have reviewed the letters written prior to Dennis Gerken's death and are of the opinion, as was the trial judge, that they do indeed reflect an individual becoming ever more and more wrapped up in a bizarre fantasy world. The last of these letters is dated late in July 1984, just weeks before Dennis was killed.

The trial court also heard several witnesses testify that prior to August 8, 1984, defendant diligently went about his farm chores and the routine tasks of daily living. However, as we have already mentioned, the experts indicated that this was not unusual for one with

defendant's affliction. Such individuals can behave in a normal fashion all the while they are becoming more and more mentally detached from reality. We note in this regard that the testimony of all the experts throughout these proceedings is surprisingly consistent relative to defendant's disability in general. But more specifically as well, Dr. Goldman and Joseph Pribyl were consistent in determining that defendant was insane at the precise moment he supposedly waived his right to remain silent. Pribyl's testimony indicated that at that time defendant was not fully able to make a sound judgment regarding his own best interests. That there was much confusion inside defendant's mind at the time he was interrogated is also confirmed by the lay witnesses who were with him, despite their opinions that defendant was sane. Sergeant Iwan wrote that the defendant drifted between fantasy and reality during the interview and referred to certain hallucinations on defendant's part. Iwan and Chancey both indicated that defendant returned again and again to his fantasies throughout the time that they interviewed him.

■ On the record before us we cannot say that the trial court failed either to consider pertinent evidence or to give any evidence its proper weight. Nor can we say that the trial court findings as to defendant's sanity and the validity of his waiver are contrary to the manifest weight of the evidence. We find this to be a case where it is undeniable that the trial court was better situated than this court to evaluate the defendant's ability to understand. *Ellison*, 126 Ill. App. 3d at 992.

■ The burden is on the State at a suppression hearing to show by a preponderance of the evidence that defendant's confession was voluntarily given. (*Ellison*, 126 Ill. App. 3d at 992.) So, too, we think the State must show by a preponderance of the evidence that a defendant voluntarily and knowingly waived his *Miranda* rights. (See *Racanelli*, 132 Ill. App. 3d at 132-33.) The State was unable to do so in the case at bar. Consequently, defendant's inculpatory statement was properly suppressed.

■ The State presents for our consideration an alternative argument based upon the public safety exception to the *Miranda* rule which was created in *New York v. Quarles* (1984), 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626. Defendant correctly points out that the State did not present this issue to the trial court for consideration. Questions not raised in the trial court are generally deemed waived and may not be raised for the first time on appeal. (*People v. Holloway* (1981), 86 Ill. 2d 78, 91, 426 N.E.2d 871.) As the *Holloway* court observed, a fundamental reason for the waiver rule is that the failure

to raise an issue at the trial level will often cause the opposing party to forego presentation of available pertinent rebuttal evidence which could be relevant to disposition of the question. (*Holloway*, 86 Ill. 2d at 91-92; see also *People v. McAdrian* (1972), 52 Ill. 2d 250, 254, 287 N.E.2d 688.) Had the State timely raised the issue of the public safety exception, defendant might have been able to produce evidence to show that it did not apply to this situation. Obviously, defendant cannot now do so. Consequently, we find that the State has waived its right to assert its alternative argument.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

DUNN and UNVERZAGT, JJ., concur.