THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY LAMERSON, Defendant-Appellant.

First District (3rd Division)   No. 1—87—0668

Opinion filed October 18, 1989.

54

WHITE, J., dissenting.

Martin Carlson, of State Appellate Defender's Office, and Coffient, Ungaretti, Harris & Slavin, both of Chicago (J. Timothy Eaton, Daniel P. Albers, and Robert A. Chapman, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Marie Quinlivan Czech, and Linda Halpern, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, Larry Lamerson, was tried by a jury and convicted of murder for which he was sentenced to an extended term of 60 years' imprisonment. Defendant argues on appeal that: (1) his trial counsel was ineffective for not raising an insanity defense due to her misapprehension of the law that the defense could not be raised because defendant had not admitted the crime; (2) the trial court improperly admitted defendant's involuntary confession; (3) testimony that defendant stated before the crime that he was "going to have to hurt someone" was improperly admitted; and (4) at sentencing, the trial court failed to consider in mitigation defendant's mental illness.

A psychiatrist reported in a letter to the court on February 5, 1985, that defendant was fit for trial. The same psychiatrist later reported that at the time of the offense defendant was legally sane. Another psychiatrist's letter of July 9, 1985, also concluded that defendant was fit for trial.

At the hearing on defendant's motions to quash arrest and to sup-

press, Chicago police officer Sydney L. Hill testified that at about 4:40 a.m. on July 4, 1984, he responded to a radio broadcast of a battery on east 38th Street in Chicago. Defendant met Hill there and told him he wanted to show Hill how he had found his stepdaughter. After entering an apartment, Hill observed a young woman with multiple head and neck wounds lying on a blood-splattered couch. Defendant's T-shirt had bloodstains in a spray pattern similar to the pattern on the wall behind the couch.

Chicago police officer Robert Utter testified that at the police station defendant was advised of his rights orally and in writing. He responded that he understood his rights, did not appear to have difficulty in understanding his rights, and was responsive to questioning. Chicago police officer Martin Anderson also testified that there was no time at which defendant did not appear to understand his rights.

Dr. Alan K. Rosenwald, a psychologist, was found by the trial court to be a qualified expert in his field. He interviewed and tested defendant on March 2 and 9, 1986, for about two to three hours on each date. Defendant was given an intelligence test, five personality tests including an ink blot test and a picture test, and tests from a mental examiner's handbook to explore his capacity to think conceptually.

The psychologist asked defendant what he would do if he was the first person at the movies to see smoke and fire. His answer was, "[Y]ou'd sound the fire alarm and you'd assist people in getting out." It was deemed ambiguous, and upon further questioning, defendant ultimately said that the best action to take was to yell fire, which was not a correct response. Defendant made several statements that appeared to be plausible but, on further examination, turned out to be implausible. When asked in what way a coat and suit were related, defendant's unacceptable response that part of a suit is a coat and a jacket did not compare the two items. Defendant had great difficulty in inferring relationships between objects that were intrinsically related.

Defendant stated that there were 51 weeks in a year and that William Faulkner wrote Hamlet. The psychologist was unaware of a work by Faulkner entitled The Hamlet but stated that no one had given this answer in the thousands of the tests he had administered. But he would not base his diagnosis on one wrong answer to the Hamlet question. On the other hand, defendant stated correctly that Martin Luther King was a Nobel Peace Prize winner and a civil rights activist. Defendant, who had had two years of college, had learned a number of items of information but did not apply them correctly.

There was also an inconsistency in his acquisition of knowledge. The court indicated that it might have answered correctly only one of the three questions.

Defendant had written a confused and illogical 20-page account describing the events leading to his arrest. Defendant struggled to have a good grasp of English but misused words frequently and the meaning he intended would become obscure. However, the psychologist did not have difficulty understanding defendant.

Dr. Rosenwald's opinion was that defendant had chronic schizophrenia for some years, including at the time of the crime, and that defendant was insane at the time of the examination. The mental disease of schizophrenia is characterized primarily by a disturbance in one's ability to think conceptually. There are frequent disturbances in logic, and the person draws incorrect conclusions on the basis of putting the wrong things together in terms of seeing relationships where none presumably exist. Often schizophrenia is characterized by delusions and hallucinations. The psychologist was not sure whether defendant was suffering from hallucinations but thought that he probably was suffering from delusions and misinterpretation of events. Defendant demonstrated clinical disturbance in thinking and unusual symbolism, which are illustrative of schizophrenia. Prognosis for defendant's recovery was poor.

Defendant was of low-average intelligence but did not function at that level because of severe intrusion into his capacity to think clearly. Defendant could understand the words of the *Miranda* rights, but he could not understand the implication of the rights. The fact that defendant had completed some college would not affect the psychologist's opinion as to his ability to understand *Miranda* warnings because he could be sufficiently psychotic to misinterpret the intent of the warnings or misunderstand the symbolism of the particular words.

Defendant's attorney argued during the motion to suppress that she did not know what tests the two court-appointed psychiatrists had given defendant, nor did she know the basis of their conclusions that defendant was malingering.

The trial court denied the motions to quash arrest and to suppress. The trial court stated that it could not come to the same conclusion that the psychologist did. The trial court indicated that the answers to the questions about the fire and the suit were logical, that it appeared that defendant had answered only one out of three questions incorrectly, and that defendant was only wrong by one week in responding to the question of how many weeks were in the year. The trial court also indicated that defendant understood what was "going

on," and was very intelligent and articulate. The trial court indicated that it was not convinced of defendant's insanity merely because defendant may have given an unpopular answer. The trial court found that defendant had understood his *Miranda* warnings and that the statement had been given voluntarily.

Defendant moved to suppress testimony by Lester Johnson that within an hour prior to the alleged murder defendant stated "I am going to jump on somebody." The State argued that the statement of future intent was a hearsay exception, and the trial court denied the motion.

Ida Mae Anderson testified at trial for the State that on July 4, 1984, she lived with her daughters and defendant. The victim, her daughter Lillie Boyd, was 16 years old. Defendant was the father of one of her children.

Marian Rogers testified for the State that about 4:30 a.m. on July 4, 1984, defendant came to her home and told her that he had gone to buy cigarettes and that when he returned he found the victim "like this." Two to three minutes later defendant returned and said that the victim was bleeding. He returned a third time and said that she had been "hammered" and he did not think she was going to "make it."

Lester Johnson testified for the State that about 3 a.m. on July 4, 1984, defendant walked up to him outside and said that he was going to have to hurt someone.

Chicago police officer Robert Utter testified that defendant stated that he had left the apartment several times and when he returned the last time he found the door ajar. Defendant further stated that he went upstairs to the kitchen, then went to the living room, saw Lillie on the couch, and informed one of the neighbors. But he had to pass through the living room within three to five feet of the couch in order to get to the kitchen. His explanation for the blood on his shirt was that he had gotten near the couch or the body.

In a subsequent conversation, Utter told defendant that he did not believe him. Defendant then said that he had returned home angry at the victim's mother for being out. He had taken a hammer from the kitchen, gone to the living room, and looked at Lillie sleeping on the couch. He had retrieved a knife from the kitchen, smashed her in the face with the hammer, hit her several times, and slashed her throat and head with the knife. He had then washed the knife and his hands, and gone to notify people that Lillie had been "hammered." He wanted to make it appear as if someone else had killed her.

Assistant State's Attorney Edward Snow testified for the State

that defendant had stated that when he returned to his apartment he was thinking about relieving himself from agony and pain. In response to a question how he was going to do that, he said "[s]pontaneous thoughts, and Lillie was the only thing I guess that I could release that frustration out on." When he saw Lillie lying on the couch, he got his hammer and stood over Lillie with the hammer, but "I knew what I got my hammer for, I guess I was kind of frightened but my intentions was [sic] to get out that frustration, I guess, just to hit her, to hit her." He went back to the kitchen and got a knife. He stood over Lillie again, and after a minute, he felt "that frustration coming on again" and "just raised the hammer" and struck her. He first hit her in the mouth and "wanted to *** make sure that she was unconscious" when he hit her the first time. After he hit her the first time, he saw that she was not unconscious. He did not want to "really inflict any unnecessary pain so *** [he] was able to see that a second and possibly third blow was necessary to get her unconscious." He struck her three or four times until she looked unconscious. He then slashed her three times across the neck with the knife.

Defendant further stated that he then returned to the kitchen, where he washed the knife and left it in the sink. He ran downstairs to a neighbor's house and said that it appeared that Lillie had been attacked by somebody because he did not want to be accused. He tried to clean up any incriminating evidence by washing the knife and by running over to the neighbors two times.

Defendant testified on his own behalf that he did not tell Johnson that he was going to hurt somebody that night. He tried to help his daughter and talked to a neighbor to have her call for help. In response to a question why the police claimed he made a statement that he beat Lillie, defendant stated that he was not in the right "frame of mind" at the time because he thought the child was dying, that his concern was to return to his family, and that the police took advantage of his "frame of mind." He denied telling the police that when he entered the apartment he went into the kitchen to get some coffee and then later saw Lillie in the living room. When asked whether he washed the knife and placed it in the sink, defendant said that that was a fabrication. He said anything he thought would be believed to get away from the police.

Defendant was found guilty of murder, and his motion for a new trial was denied. At the sentencing hearing, the trial court considered Anderson's victim impact statement and defendant's stepsister, Avis Downs, testified on his behalf. Defense counsel stated that reexamination of defendant for purposes of sentencing was unnecessary and:

"The defense of insanity was not asserted at trial, due to the fact that Mr. Lamerson has indicated he was not present at the time of the actual killing and he never said he did it, to his lawyers, at any rate. So we couldn't in fact really put a defense on during the course of the trial, Judge."

The trial court considered in mitigation that this was defendant's first offense. But the trial court found the conduct to be exceptionally heinous and brutal and found that the public needed to be protected from defendant. An extended-term sentence of 60 years' imprisonment was imposed.

Defendant first argues that his trial counsel was ineffective for not raising an insanity defense due to her misapprehension of the law that the defense could not be raised because defendant had not admitted the crime. Defendant cites as controlling *People v. Rainey* (1986), 149 Ill. App. 3d 327, 500 N.E.2d 602, in which defense counsel was ineffective for not raising the defense of mental illness at trial. In *Rainey*, there was a clear statement by defense counsel that he believed that it was not possible to raise the defense at trial when defendant denied committing the offense. In addition, the record of ineffectiveness of counsel was clear in *People v. Fernandez* (1987), 162 Ill. App. 3d 981, 516 N.E.2d 366, because the attorney admitted that it had been her misunderstanding of the law rather than a tactical consideration that prompted her not to file a motion to suppress until the trial had begun.

■ Defendant must prove that his attorney's representation fell below an objective standard of reasonableness. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) But trial strategy is not reviewable in considering a claim of ineffectiveness of counsel. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 812, 494 N.E.2d 688.) It is not clear whether defense counsel misapprehended the law or felt that practically, as a matter of trial strategy, it was not advisable to present evidence of insanity and to deny commission of the offense. Defense counsel also could have believed that a jury would also reject the psychologist's testimony that defendant was insane. But, while in hindsight the reviewing court might have acted differently in presenting the defense, such decisions were matters of judgment and do not demonstrate incompetency of counsel. (*People v. Johnson* (1978), 63 Ill. App. 3d 745, 750, 380 N.E.2d 531.) Even assuming *arguendo* that defense counsel misapprehended the law and therefore provided ineffective assistance of counsel, there was no reasonable probability that but for her error the result would have been different.

■ Ineffective assistance of counsel must result in prejudice to the defendant. The defendant must establish that there is a reasonable probability that the outcome of the trial would have been different. (*People v. Weir* (1986), 111 Ill. 2d 334, 338, 490 N.E.2d 1.) In contrast, the trial court in *Rainey* stated that had the evidence been placed before it, it would have found defendant guilty but mentally ill instead of guilty.

Defendant next argues that the trial court improperly denied his motion to suppress and admitted defendant's confession. Defendant argues that the trial court erred in disregarding the psychologist's conclusions based on its own brief observations of defendant and on its disparagement of the psychologist's characterization of certain of defendant's answers to psychological tests as incorrect. Defendant also argues that the trial court did not rely upon any lay testimony and did not question the psychologist's credibility or the factual bases for his opinion.

■■ An involuntary statement is inadmissible. (*People v. Madden* (1986), 148 Ill. App. 3d 988, 996, 501 N.E.2d 1297.) A confession of an insane person must be suppressed because he could not know of his constitutional rights. (*People v. Lambersky* (1951), 410 Ill. 451, 455, 102 N.E.2d 326.) An insane person cannot commit the intentional act of waiving the right against self-incrimination. (*People v. Shroyer* (1929), 336 Ill. 324, 326, 168 N.E. 336; see also *People v. Nau* (1988), 167 Ill. App. 3d 338, 521 N.E.2d 177 (defendant's inculpatory statement suppressed because insane when waived rights).) To determine whether a waiver was knowing and voluntary, the characteristics of defendant which bear upon his ability to make knowledgeable and independent decisions must be considered. (*Nau*, 167 Ill. App. 3d at 346.) It is the State's burden to show that a statement was knowingly and voluntarily made. (*Madden*, 148 Ill. App. 3d at 996.) The trial court's finding on the issue of voluntariness is not to be disturbed unless it is contrary to the manifest weight of the evidence. *Madden*, 148 Ill. App. 3d at 996.

■ The trial court is not obliged to accept the opinion of psychiatrists. (*People v. Williams* (1980), 87 Ill. App. 3d 860, 864, 409 N.E.2d 439.) The credibility and weight to be given psychiatric testimony is for the trier of fact. (*Williams*, 87 Ill. App. 3d at 864.) The factual bases for the experts' opinions are to be analyzed and evaluated. (*Williams*, 87 Ill. App. 3d at 864.) The fact finder may reject all expert testimony and rely on lay testimony in concluding that defendant was sane, or the fact finder may accept part of each expert's testimony and reject other parts of the testimony. *People v. Eckhardt*

(1987), 156 Ill. App. 3d 1077, 1096, 509 N.E.2d 1361.

In *Williams*, it was held that the trial court could not reject the uncontradicted conclusions of psychiatrists that defendant was unfit solely on the basis of the trial court's brief and casual exposure to defendant or from the court's "common sense" interpretation of the psychiatric opinions. Similarly, in *People v. Garcia* (1987), 156 Ill. App. 3d 417, 509 N.E.2d 600, the trial court's rejection of the insanity defense was not upheld where both psychiatrists had testified that defendant was insane and where the trial court had not questioned the experts' credibility. The court merely drew different conclusions than did the psychiatrists. See also *People v. Arndt* (1980), 86 Ill. App. 3d 744, 749, 408 N.E.2d 757.

■ Here there was testimony of two police officers that defendant appeared to understand his rights. The trial court did not explicitly state that it was rejecting the expert testimony in favor of the lay testimony that defendant understood his rights at the time of his confession, but the trial court was bound to consider all the evidence, and its comments indicate that it did not find the psychologist's testimony credible. In addition we do not know what weight the court gave to the psychiatric reports it had received. Therefore, the trial court properly denied defendant's motion to suppress.

■ Defendant next argues that the trial court erred in admitting the testimony that defendant had said he was going to have to hurt someone. Defendant argues that the general statement was inadmissible because it was not linked to the victim. Threats against the victim are admissible to show malice and criminal intent if linked to the victim. (*People v. Watkins* (1975), 34 Ill. App. 3d 369, 374, 340 N.E.2d 92.) The language used must be broad enough to include the victim within its terms. (*People v. Scott* (1918), 284 Ill. 465, 474, 120 N.E. 553.) A threat not directed to any particular person is not admissible to show malice towards the deceased. *Scott*, 284 Ill. at 474.

■ Lester Johnson testified during direct examination that the defendant stated to him that he was going to have to hurt someone. Defendant's objection was overruled. The State thereby was given an opportunity by the court to connect the threat with the victim by any additional testimony of Lester Johnson or any other State witness. Neither before nor after the State rested did the defendant renew his motion by moving to strike the testimony or asking that the jury be instructed to disregard it. He may not raise this issue on appeal. *People v. Jayne* (1977), 52 Ill. App. 3d 990, 1008, 368 N.E.2d 422; *Isenhart v. Seibert* (1955), 6 Ill. App. 2d 220, 127 N.E.2d 469.

■ Defendant next argues that the extended-term sentence of 60

years' imprisonment was improper and excessive because the trial court improperly weighed defendant's mental status and capacity. Defendant argues that the trial court's conclusions that he was intelligent, well-spoken, appeared to have good reasoning abilities, and communicated with people were contrary to the manifest weight of the evidence. Defendant points to his confession as bizarre, inconsistent, and revealing his low intelligence and inability to communicate. However, even if the trial court erred in making these conclusions, defendant's intelligence and communication skills are irrelevant to the length of his sentence.

Defendant also argues that the trial court imposed punishment based on a misperception that he committed a willful act and that he demonstrated no remorse when the manifest weight of the evidence showed defendant's actions resulted from a mental illness "beyond his control." We have already determined that the trial court did not err in rejecting defendant's claim of insanity.

The judgment of the circuit court is affirmed.

Affirmed.

RIZZI, J., concurs.

JUSTICE WHITE, dissenting:
I would reverse defendant's conviction because he was denied the effective assistance of counsel due to counsel's failure to raise insanity as a defense.

Everything about this case raises serious doubts about defendant's sanity: the senseless, brutal way he bashed and slashed his stepdaughter, Lillie, to death; defendant's explanation of the crime given in his confession that he was thinking about relieving himself from "agony, pain" and was having "spontaneous thoughts, and Lillie was the only thing I guess I could release that frustration out on"; the statement defendant gave when, splattered with blood, he was taken by police from the body of his stepdaughter and complained that he did not want to leave his other three children alone; and the expert testimony of Alan K. Rosenwald that defendant was insane and had been so for some years. Yet, defense counsel did not raise insanity as a defense and gave this as the reason:

> "The defense of insanity was not asserted at trial, due to the fact that Mr. Lamerson has indicated he was not present at the time of the actual killing, and he never said he did it, to his lawyers, at any rate. So we couldn't in fact, really put that de-

fense in during the course of the trial, Judge."

Defense counsel was simply mistaken as to the law. As explained in *People v. Ford* (1968), 39 Ill. 2d 318, 321, 235 N.E.2d 576, 578, "[t]here is no reason why defendant may not deny commission of the crime and also raise the affirmative defense of insanity." Trial lawyer's similar mistake regarding the law was called egregious error in *People v. Rainey* (1986), 149 Ill. App. 3d 327, 500 N.E.2d 602; it was equally egregious here, and the failure to assert the defense of insanity left defendant virtually with no defense.

The majority's attempt to distinguish *Rainey* is ineffective. The majority states:

> "In *Rainey*, there was a clear statement by defense counsel that he believed that it was not possible to raise the defense at trial when defendant denied committing the offense." (190 Ill. App. 3d at 59.)

The majority ignores the fact that in the case at bar defense counsel made it equally clear that she believed she could not raise the defense of insanity because defendant claimed that he was not present at the time the murder was committed.

The majority concludes that "there was no reasonable probability that but for her [the trial attorney's] error the result would have been different." (190 Ill. App. 3d at 59.) I disagree and therefore I dissent.