THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KARL MORGAN, Defendant-Appellant.

Fifth District    No. 5—92—0153

Opinion filed September 17, 1993.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Defendant, Karl Keith Morgan, was charged in the circuit court of St. Clair County with the murder of 80-year-old Gertrude Eastwood. After a trial by jury, Morgan was found guilty of first-degree murder. The jury subsequently found Morgan eligible for the death penalty because the murder had taken place in the course of a sexual assault and a burglary. After a further hearing, the jury was unable to unanimously agree upon the imposition of the death penalty. The trial court subsequently sentenced Morgan to a term of natural life imprisonment.

Prior to trial, the State filed notice that it intended to seek the death penalty. The defendant moved to have a psychologist appointed to evaluate his fitness to stand trial. He also moved to suppress evidence of his statements to police on the grounds that he had not been competent to waive his rights against self-incrimination and because such statements were otherwise illegally obtained.

At the hearing on the motion to suppress, Dr. Daniel Cuneo, a clinical psychologist, was appointed to examine Morgan. Dr. Cuneo evaluated Morgan as having a mental illness consisting of alcohol dependence and polysubstance abuse. Dr. Cuneo's report indicates that because of defendant's use of alcohol at the time of the offense, he was not competent to waive his rights when the police took his statement. Dr. Cuneo also found that while mentally ill at the time of the offense, defendant would not qualify for an insanity defense and was competent to stand trial.

At the hearing on defendant's motion to suppress, State Police Detectives Robert Knezevich and Donald Leach testified. After

viewing the crime scene, they went to State Police headquarters where defendant was being held. They first spoke with Gary Douthit, defendant's friend, who had been arrested along with him. They then questioned the defendant. Both testified that they observed that while defendant did not appear to be intoxicated, defendant had been drinking. Knezevich stated that defendant did not appear intoxicated and was calm and relaxed. Defendant was again read his *Miranda* rights and never indicated that he did not understand his rights. Defendant also signed a waiver of rights. Defendant was initially calm and appeared to understand what was going on. He was cooperative and willing to answer questions. After being told by the detectives that they did not believe defendant's initial story that he had spent the day visiting friends, defendant broke down and gave the statement in question to them. Defendant read the statement, made some changes, and signed it. In his statement, defendant indicated that he did not specifically remember stabbing Eastwood but knew that he had done it and that the blood on his pants was hers. He also believed that he had sexually assaulted her but again did not specifically remember. He did remember going to her house, being admitted by Eastwood, and taking money and two television sets. Defendant was able to describe details of the crime scene that were not common knowledge. Detective Leach testified that defendant signed his waiver of rights willingly. Defendant indicated that he understood his rights. He also indicated defendant seemed somewhat nervous and anxious. After signing his waiver of rights form, defendant said he had been drinking most of the previous day and evening. When the detectives told defendant they thought he was responsible, he asked for a cigarette and gave them the statement in question, which Leach reduced to writing. After making a few changes, defendant signed each page.

State Police Troopers William White and Mark Sprankle and Sergeant Stanley Donald also testified. Sergeant Donald testified that on the night in question, he received a call from Bill Wolfe, one of Eastwood's neighbors, reporting that he had seen a man walking around a neighbor's house and that he later saw the same man carrying something down an alley. The man set the object down and got into a black AMC Pacer automobile. Sergeant Donald dispatched Trooper Mark Sprankle to the scene. Sergeant Donald testified that he later went to the scene himself, where he saw defendant with blood on his pants. Sergeant Donald also testified that while it was obvious that defendant had been drinking, he was able to walk unassisted.

Trooper Sprankle testified that he was dispatched to the scene to investigate a possible burglary. Sprankle testified that upon arriving at the scene, he spoke to Wolfe, who stated that he had heard his dog barking, and when he went to investigate he saw a white man in the alley, and the man ducked out of sight when he turned on the light. Wolfe went back to watching TV, but his dog began barking again. Wolfe again went to investigate and saw the same man carrying something. The man set the object down and got into a black AMC Pacer that had just driven up with its lights off. Sprankle then checked the alley between the houses where he found two television sets. Sprankle called Trooper White and told him to look for a black AMC Pacer occupied by two white males who were wanted for burglary. While on the porch of the victim's house, he observed White make a traffic stop approximately one-half block away. Defendant was placed under arrest for burglary and read his *Miranda* rights. Sprankle then entered Eastwood's home through an unlocked side door where he found her body. Sprankle also testified that he could smell alcohol on defendant's breath. Sprankle further testified that defendant had not seemed intoxicated, and when given his *Miranda* warnings, defendant indicated that he understood.

Trooper White testified that he was called to the scene by Sprankle to assist with a possible burglary. While en route, he was told that two male suspects left the scene in a dark-colored AMC Pacer. Upon arriving at the scene, White observed a black AMC Pacer with two male occupants at the other end of the block. White stopped the car and Sprankle came up to assist. White testified that he and Sprankle read the defendant his *Miranda* rights and that defendant appeared to understand. White also testified that he smelled alcohol on defendant's breath, but that defendant could walk unassisted.

Dr. Cuneo testified that he first saw defendant on July 19, 1991, and saw him two more times subsequently. Dr. Cuneo also reviewed defendant's hospital records and the police records and gave defendant a standard psychological test. Based upon these factors, Dr. Cuneo concluded that defendant was an alcohol-dependent polysubstance abuser. Dr. Cuneo also testified that defendant had a history of going on prolonged drinking binges after arguing with his girl friend. One such episode had occurred in 1990 prior to his attempt to commit suicide with alcohol, and another occurred prior to the night of defendant's arrest for the murder of Eastwood. Dr. Cuneo opined:

"If Mr. Morgan had been on a bender, and if Mr. Morgan had been drinking steadily during this period of time, and if Mr. Morgan had also abused different types of drugs during this period of time, and again, *this is self-reported to me he had stated,* then Mr. Morgan would not have had the ability to intelligently and knowingly and willfully waive his right—his rights at that time." (Emphasis added.)

Dr. Cuneo admitted that he did not have personal knowledge of defendant's condition at the time of questioning or what defendant's blood-alcohol content had been.

The defendant testified that he had little or no recollection of talking with police. Defendant indicated that he suffered blackouts and believed he was drunk when he talked with the police. He did not know how much he had had to drink on November 22, 1990, but he had been drinking most of the day. He did not remember making any statements to police or signing any documents. Defendant also testified that he knew he had been drinking beer on November 23, 1990, because he remembered taking a case to Gary Douthit's house.

The trial court denied defendant's motion to suppress, finding that under the totality of the circumstances, the defendant's waiver of his rights and his statements to police had been voluntarily, knowingly, and willingly made.

At trial, Detectives Knezevich and Leach testified about their interrogation of Douthit and the defendant. They recounted the circumstances surrounding defendant's making his statement, and over objection, Leach read defendant's statement in which defendant admitted robbing, raping, and murdering Eastwood. Sergeant Donald and Troopers Sprankle and White testified to the circumstances of their investigation and subsequent arrest of the defendant.

Gary Douthit testified that he had pleaded guilty to theft over $300 and received a sentence of probation. Douthit was a friend of the defendant's and had worked with him at Relleke Farms. Defendant and his brother had spent November 23, 1990, drinking beer with Douthit at his house. Defendant left around 9:30 p.m. to get more beer. He returned around midnight and awakened Douthit and asked Douthit to help him get some televisions he had stolen. He agreed to give Douthit $250 for his help. It was while attempting to retrieve the stolen televisions that Douthit and defendant were stopped by police and arrested. Douthit testified that he did

not know there had been a murder until police questioned him about it.

Dr. Cuneo testified that defendant was alcohol dependent and a polysubstance abuser. Dr. Cuneo also testified that defendant had a history of alcohol abuse going back to the age of eight and of going on "benders" from four to seven days. Defendant suffered blackouts from drinking and had the "shakes" and memory losses when he did not drink. Defendant had attempted suicide eight times. Dr. Cuneo testified that alcohol-dependent individuals could become mentally impaired from drinking without displaying any physical signs of drunkenness. Dr. Cuneo opined that the defendant had been so intoxicated at the time of the offense that he could not have formed the intent to commit murder.

Defendant testified that he was 29 years old and had been drinking since age eight. He had been hospitalized in the past for alcohol abuse and suicide attempts. He suffered memory losses and blackouts from drinking. He had worked for eight years at Relleke Farms as a farmhand. He knew Eastwood and had performed odd jobs for her.

Defendant also testified that he had been drinking beer for two days prior to November 23, 1990. On that day he had been at Douthit's house drinking beer and whiskey. He did not remember leaving Douthit's house, going to Eastwood's house, being arrested, or talking with police. Defendant stated that he did not think he could have killed Eastwood, but if he had, he apologized to her family.

■ On appeal, defendant argues that his waiver of his *Miranda* rights was not knowingly and intelligently made, and the use of his statement made after such waiver denied him a fair trial.

For a defendant's confession to be admissible at trial, the State must prove by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his privilege against self-incrimination and his right to counsel. (*People v. Reid* (1990), 136 Ill. 2d 27, 54, 554 N.E.2d 174, 185, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123, 126.) In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, the trial court must consider the totality of the circumstances without any one factor controlling. (*Reid*, 136 Ill. 2d at 54-55, 554 N.E.2d at 187.) Whether a defendant validly waived his rights is essentially a question of fact and will not be disturbed un-

less it is against the manifest weight of the evidence. *People v. Woidtke* (1992), 224 Ill. App. 3d 791, 587 N.E.2d 1101.

Defendant maintains that the trial court's ruling was erroneous because the State failed to rebut the testimony of Dr. Cuneo that given the amount of alcohol defendant had consumed he would not be capable of knowingly and intelligently waiving his rights. The trial court is not obliged, however, to accept the opinions of psychologists. (See *People v. Lamerson* (1989), 190 Ill. App. 3d 52, 545 N.E.2d 1025.) Because an expert's opinion is only as valid as the underlying basis or reasons, the trial court must analyze the factual bases for such opinion. (*People v. Williams* (1980), 87 Ill. App. 3d 860, 409 N.E.2d 439.) In the present case, Dr. Cuneo based his opinion on several assumptions: that defendant had been drinking for at least 24 hours prior to his arrest; that he was still under the influence of alcohol at the time he confessed to the murder; and that he was recovering from a "bender" at the time of his statements to police. Based upon these assumptions, Dr. Cuneo opined that defendant would not have been able to knowingly and intelligently waive his rights. As Dr. Cuneo himself acknowledged, much of the information he relied upon came from the defendant. Where an expert's opinion is based upon the credibility of the defendant, however, such opinion is questionable. (*People v. Rogers* (1988), 123 Ill. 2d 487, 528 N.E.2d 667.) There was no evidence of defendant's blood-alcohol content at the time of his arrest and subsequent statements to the police. The only evidence of drinking prior to the murder came from defendant and Douthit. Given the totality of the circumstances, we cannot say that the trial court's ruling on defendant's motion to suppress was against the manifest weight of the evidence.

■ Defendant next argues that his sentence of natural life imprisonment is excessive and represents an abuse of discretion. Defendant contends that such a sentence completely rejects the possibility of rehabilitation, a possibility that could be realized, defendant maintains, if he were to receive treatment for his alcohol- and polysubstance-abuse problems.

Imposition of sentence rests with the sound discretion of the trial court, and the trial court's decision will not be reversed absent an abuse of that discretion. (*People v. Boyle* (1987), 161 Ill. App. 3d 1054, 1097, 514 N.E.2d 1169, 1196, citing *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Further, where a sentence is within the statutory limits, it will not be set aside on review unless it is "manifestly disproportionate to the nature of the offense."

(*People v. Costello* (1992), 224 Ill. App. 3d 500, 510, 586 N.E.2d 742, 749.) The defendant concedes that his natural life prison sentence was within the statutory guidelines, but he argues that in imposing such a sentence, the trial court rejected any consideration of rehabilitation. With respect to defendant's rehabilitative potential, we presume that the trial court took this factor into consideration, as there is nothing in the record indicating otherwise. (*People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373.) While the defendant's rehabilitative potential is a factor to be considered, the trial court is not required to give greater weight to that consideration than to the seriousness of the offense. (*People v. Fort* (1992), 229 Ill. App. 3d 336, 341-42, 592 N.E.2d 1205, 1210; *People v. Dower* (1991), 218 Ill. App. 3d 844, 578 N.E.2d 1153.) The nature of the crime, the protection of the public, deterrence, and punishment all have equal status in the determination. (*People v. Generally* (1988), 170 Ill. App. 3d 668, 677, 525 N.E.2d 106, 111.) The trial court is not required, however, to find that the defendant has no rehabilitative potential before sentencing him to a term of natural life. *People v. Walker* (1992), 227 Ill. App. 3d 102, 106, 590 N.E.2d 1018, 1021, citing *People v. Chambers* (1990), 200 Ill. App. 3d 538, 549, 558 N.E.2d 274, 282.

In the present case, defendant was convicted of stabbing an 80-year-old woman to death during the course of committing burglary and aggravated criminal sexual assault. The trial court found the following factors in aggravation: that the offense was committed during the course of a burglary; that the victim was over 60 years old; that the defendant had a history of criminal behavior; and that defendant's actions were heinous, brutal, and indicative of wanton cruelty. With respect to mitigation, the record demonstrates that the trial court considered defendant's presentence investigation report, the supplements thereto, and defendant's alcoholism. We cannot say that the trial court's sentence of natural life imprisonment was an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

GOLDENHERSH and MAAG, JJ., concur.