(No. 71903.—

*In re* RALPH NAU (The People of the State of Illinois, Appellant, v. Ralph Nau, Appellee).

*Opinion filed December 4, 1992.*

FREEMAN, J., concurring in part and dissenting in part.

Roland W. Burris, Attorney General, of Springfield, and Gary V. Johnson, State's Attorney, of Geneva (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Thomas L. Ciecko and Marcia L. Friedl, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, William L. Browers and Cynthia N. Schneider, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

John B. Lower and William E. Coffin, of Elgin, of the Guardianship and Advocacy Commission, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

This case comes to us on appeal from two orders of the circuit court of Kane County. The first order, entered on December 11, 1989, found respondent, Ralph Nau, to be a person subject to involuntary admission and directed that he be committed to the Department of Mental Health Facility in Elgin, Illinois. The second order, entered on May 9, 1990, continued respondent's involun-

tary hospitalization in the Elgin facility for an additional 60-day period. Respondent appealed both orders, seeking reversal of both on the ground that the State did not comply with certain provisions of the Mental Health and Developmental Disabilities Code (the Code) (Ill. Rev. Stat. 1989, ch. 91½, par. 1—100 *et seq.*). The appellate court, after consolidating the two appeals, reversed both orders. (209 Ill. App. 3d 805.) We allowed the State's petition for leave to appeal (134 Ill. 2d R. 315).

The saga of events which led to the two commitment orders at issue in this appeal began in August 1984. On August 9, 1984, respondent was charged by indictment with the murder of his eight-year-old stepbrother, Dennis Gerken. Respondent was twice found unfit to stand trial on the murder charge. Accordingly, at respondent's request, a discharge hearing was held pursuant to sections 104—23 and 104—25 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, pars. 104—23, 104—25).

Section 104—23 provides that, upon a determination that there is no substantial probability that an unfit defendant will attain fitness within one year, the defendant may move for a discharge hearing pursuant to section 104—25. (Ill. Rev. Stat. 1989, ch. 38, par. 104—23(a).) A discharge hearing, sometimes called an "innocent only" hearing, allows the defendant to test the sufficiency of the State's evidence of his guilt of the charged crime. The State and the defendant are permitted to introduce evidence relevant to the defendant's guilt. If the evidence does not prove the defendant's guilt beyond a reasonable doubt, the court must enter a judgment of acquittal. Following such an acquittal, the State may seek to have the defendant committed to the Department of Mental Health and Developmental Disabilities. If the hearing does not result in an acquittal, the defendant may be remanded for further treatment,

but a conviction may not be entered. Ill. Rev. Stat. 1989, ch. 38, par. 104—25; see also *People v. Lang* (1986), 113 Ill. 2d 407, 445-46.

Prior to the commencement of the discharge hearing, respondent moved to suppress certain statements he made to police regarding his stepbrother's murder. Following a hearing, the trial court granted the motion to suppress, finding that respondent was not sane at the time he was given *Miranda* warnings and that he therefore did not knowingly and meaningfully waive his rights prior to giving the statements. The suppression order was affirmed by the appellate court. *People v. Nau* (1988), 167 Ill. App. 3d 338.

The discharge hearing was held on May 11, 12 and 15, 1989. On May 31, 1989, the trial court entered judgment for respondent, thereby acquitting him of the murder of Dennis Gerken. In reaching this decision, the trial judge remarked as follows:

> "[T]he Court finds that Ralph Nau probably committed this offense based only upon the evidence presented. *** However, [defense] counsel's argument as to the time-defined window of opportunity with regard to this defendant and others is somewhat persuasive. Given the lack of hard or concrete circumstantial evidence ***, when combined with the very limited opportunity in which the defendant could have carried out this crime, *** the Court cannot rule out every reasonable hypothesis. On that basis, the Court intends to enter a judgment in favor of the defendant on this hearing."

Following respondent's acquittal, the State chose to seek respondent's involuntary commitment under the Code. Accordingly, on June 1, 1989, the State filed its initial petition for respondent's involuntary admission pursuant to article VI of chapter 3 of the Code (hereinafter article VI) (Ill. Rev. Stat. 1989, ch. 91½, par. 3—600 *et seq.*). A stipulated bench hearing on the petition was

conducted on December 11, 1989. The trial court indicated that it had read and considered 12 stipulated items, including the transcripts of several earlier proceedings in the case and numerous psychiatric evaluations of respondent.

Following arguments of counsel, the trial court held that respondent was subject to involuntary admission. Accordingly, on December 11, 1989, the trial court ordered that respondent be admitted to the Department of Mental Health and Developmental Disabilities on an involuntary basis. Pursuant to section 3—813 of the Code, this order of admission would expire after 60 days. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813(a).) Respondent filed a timely notice of appeal from this order.

Thereafter, on February 9, 1990, the State filed a petition to continue respondent's involuntary hospitalization. A jury trial on the petition was held on May 7, 1990, at which 12 witnesses testified over two days.

Health specialist Sarah Berry testified that she saw respondent every day and met with him weekly for counseling. Respondent told Berry that he was in love with television stars and that he wrote to Vanna White. Respondent stated that game show hostess Vanna White communicated with him through the television. Respondent told Berry that he was in love with television personality Joan Lunden, who, respondent said, would divorce her husband and move in with him. Respondent also stated that Joan Lunden and other female stars would come and rescue him from the hospital. According to Berry, she had been unable to make any progress with respondent.

Respondent's social worker, Robert Hamlin, testified that respondent exhibited delusional behavior and low self-esteem. Respondent told him that female television personalities, including Vanna White, Linda Yu and Joan Lunden, were sending him messages through the televi-

sion and would be coming to rescue him. Hamlin testified that respondent's thoughts were so distorted that they interfered with his daily functioning.

Chester Iwan, a lieutenant with the Lake County sheriff's department, testified that on the evening of August 8, 1984, he received a call regarding the disappearance of Dennis Gerken. Lieutenant Iwan spoke with respondent, Dennis' stepbrother, at his home regarding Dennis' disappearance. Lieutenant Iwan asked respondent if he knew where Dennis was, and respondent stated that Dennis must have gone with his mother. When the lieutenant found out that Dennis' mother was deceased, he spoke with respondent a second time and asked respondent to accompany him to the sheriff's department. At the sheriff's department, respondent told Iwan that he had buried a dog in an area near the barn. A police search of that area revealed the buried body of Dennis Gerken.

Lieutenant Iwan testified that he interviewed respondent again during the morning of August 9. At that time, respondent stated that he remembered hitting something with an axe. Respondent then related that he went to Dennis' room, helped him dress, and took him out of the house. Respondent stated that, while he was walking with Dennis, Dennis turned into an animal. Respondent stated that he struck the animal with an axe and buried it. Lieutenant Iwan testified that Dennis' body was found with deep lacerations in his head. The police seized the clothes and boots respondent had been wearing on the evening of August 8. The clothes had been laundered and the boots had been freshly scrubbed. Lieutenant Iwan further testified that an axe and a shovel were found at the locations where respondent said they would be found.

Dr. Jasmeet Sekhon, a psychologist, also testified at the commitment hearing. Dr. Sekhon stated that he had

administered a series of tests upon respondent. The results of these tests indicated that respondent had a great deal of difficulty with reality and that he used a fantasy life for gratification. Dr. Sekhon also testified that respondent suffered from chronic schizophrenia, paranoid type.

Dr. Edith Hartman, a psychiatrist, testified that she also had evaluated respondent and had concluded that he suffered from schizophrenic paranoia. Dr. Hartman stated that respondent was a danger to himself and others, and that he could provide for himself only in a secured setting.

Dr. Syed Anwar, a psychiatrist at the Elgin Mental Health Center, testified that he had observed respondent, seen respondent's records and met with respondent every two weeks. Dr. Anwar opined that respondent suffered from paranoid schizophrenia. Dr. Anwar testified that respondent was obsessed with delusional thoughts and that his delusions had not changed since he was first hospitalized.

The prosecuting attorney at respondent's discharge hearing also testified at the commitment hearing. The prosecutor testified that, at the discharge hearing, the trial judge had suppressed some physical evidence and the inculpatory statements that respondent made to Lieutenant Iwan.

Various nonmedical witnesses testified that respondent was quiet, friendly and cooperative. They also stated that his room was clean and his appearance was neat and well groomed. The witnesses testified that respondent watched a great deal of television and was in a vocational program.

Following closing arguments, the jury returned a verdict finding that respondent continued to be subject to involuntary admission. The trial judge entered judgment on the verdict and ordered that respondent continue to

be hospitalized at the Elgin facility. Respondent's motion for a new trial was denied and respondent appealed to the appellate court.

As noted, the appellate court consolidated respondent's appeals from the two orders and reversed both. As to the initial order of commitment, the appellate court held that the State's failure to strictly comply with the Code's notice provisions rendered the order invalid. As to the order continuing respondent's commitment, the appellate court held that reversal was required because the State had filed the petition to continue hospitalization one day late. The State appeals to this court, arguing that the appellate court erred in both instances.

I

The State first contends that the appellate court erred in reversing the December 11, 1989, order directing respondent's initial involuntary commitment. As noted, the appellate court reversed that order based upon the State's failure to strictly comply with the notice procedures found in section 3—611 of the Code (Ill. Rev. Stat. 1989, ch. 91½, par. 3—611).

The petition for respondent's initial commitment to the Elgin facility was filed pursuant to article VI of the Code, entitled "Emergency Admission by Certification" (Ill. Rev. Stat. 1989, ch. 91½, par. 3—600 et seq.). This article governs the emergency involuntary admission of a person in need of immediate hospitalization to a mental health facility. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—600.) The article requires the filing of a petition for such admission, accompanied by a certificate executed by "a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization." (Ill. Rev. Stat. 1989, ch. 91½, par. 3—602.) The article also sets forth the procedures which must be followed

when the State seeks to commit a respondent pursuant to this article. In particular, section 3—611 provides, in pertinent part:

"Upon the filing of the petition and *** certificate, the court shall set a hearing to be held within 5 days *** after receipt of the petition. The court shall direct that notice of the time and place of the hearing be served upon the respondent ***." Ill. Rev. Stat. 1989, ch. 91½, par. 3—611.

Respondent urges that the appellate court correctly determined that section 3—611 was violated because he was not served with notice of the hearing *at the direction of* the trial court. The record reveals that the petition for respondent's involuntary admission was filed in the circuit court between 2:03 and 2:04 p.m. on June 1, 1989. The notice of hearing, which states that it was served upon respondent on June 1, 1989, was filed in the circuit court at 2:05 p.m. on the same date. Respondent contends that these facts indicate that he was served with notice *before* the petition was filed and, therefore, *before* the trial court could set the hearing date and direct that notice be served upon the respondent. Thus, respondent argues, section 3—611's mandate that "the court shall direct that notice of the time and place of the hearing be served on respondent" could not have been followed. Respondent points to several appellate court opinions which have held that noncompliance with this particular requirement warrants reversal of the resulting commitment orders. See *In re Long* (1990), 203 Ill. App. 3d 357; *In re Price* (1987), 152 Ill. App. 3d 960; *In re King* (1986), 148 Ill. App. 3d 741 (reversing commitment orders because the respondent was not served with notice at the direction of the trial court).

The State argues that reversal of the order was not warranted because respondent waived any challenge to the sufficiency of the notice he received by failing to ob-

ject in the trial court. The failure to raise an issue in the trial court generally results in a waiver of the issue on appeal. See *People v. Lang* (1986), 113 Ill. 2d 407, 469.

The State relies on this court's recent decision in *In re Splett* (1991), 143 Ill. 2d 225, as authority for its position. In *Splett*, the State filed a petition seeking the respondent's involuntary admission to a mental health facility. Following a hearing on the petition, the trial court ordered the respondent involuntarily committed. The respondent appealed, contending that the order was ineffective because the record failed to show that he had been formally served with notice of the involuntary admission hearing. The appellate court agreed and reversed the commitment order, holding that the Code required affirmative proof that the respondent received formal notice of the proceedings. *In re Splett* (1990), 194 Ill. App. 3d 391.

This court in *Splett* held that the defect in notice did not require reversal of the commitment order. Rather, the court determined that, under the circumstances of that case, the asserted defect was harmless. As was stated:

> "When it is evident that a respondent received actual notice of the proceeding against him, then a commitment order, based upon clear and convincing evidence and issued by a circuit court after a hearing on the merits, may be deemed proper in an appropriate case even though the record does not demonstrate that respondent received formal notice as well." *Splett*, 143 Ill. 2d at 230-31.

In *Splett*, the court focused on the fact that the respondent had clearly received actual notice of the hearing on the petition. The respondent's actual notice was evidenced by the fact that the respondent was present at the hearing and was represented by counsel; the respondent's counsel answered ready, cross-examined the State's witnesses, and argued the merits of the case; and

neither the respondent nor his counsel objected to the sufficiency of the notice. The court further focused on the fact that the respondent was in no manner prejudiced by the lack of formal notice. Based upon these facts, this court determined that the purposes behind the notice requirement had been satisfied because the respondent had been afforded the time to prepare for the hearing and the opportunity to be heard on the resolution of the matter. (*Splett*, 143 Ill. 2d at 232.) Accordingly, the court concluded, the lack of an affirmative indication that the respondent had been formally served with notice was not a sufficient ground upon which to reverse the commitment order. (*Splett*, 143 Ill. 2d at 232.) This court refused to "construe the statute as requiring the performance of an empty formality when the legislative intent has been otherwise achieved." *Splett*, 143 Ill. 2d at 232.

We find *Splett* to be dispositive of the notice issue now before us. The facts here closely parallel those of *Splett*. It is undisputed that respondent received actual notice of the hearing in this case. Respondent appeared at the December 11, 1989, bench hearing and was represented by counsel. Respondent's counsel argued motions on respondent's behalf, responded to the State's motions, and made a strenuous closing argument on respondent's behalf.

It is also undisputed that neither respondent nor his counsel ever objected to the sufficiency of the notice in the trial court. Respondent's counsel appeared before the trial court on the date originally set for the hearing and on numerous other occasions for prehearing matters. No complaint regarding the notice was made on any of these occasions, nor was any such objection made when the hearing on the petition ultimately took place. In fact, during the December hearing, the following col-

loquy took place between the trial judge and respondent's attorney:

"THE COURT: *** Is there any issue as to the propriety of the notice to the Respondent of this hearing?

[Respondent's Counsel]: No, your honor. This petition was timely filed.

THE COURT: And it appears to the Court that the Respondent was properly served with notice?

Is that also correct?

[Respondent's Counsel]: Yes, your honor. I believe that the court file does indicate proper service."

In addition, respondent does not assert, and the record does not indicate, that respondent was in any manner prejudiced by the fact that the notice was served before the trial court had a chance to direct it.

It is clear that here, as in *Splett*, the notice respondent received "afforded [him] the time to prepare for the proceeding and allowed [him] an opportunity to be heard on the disposition of the matter." (*Splett*, 143 Ill. 2d at 232.) The purposes behind section 3–611's notice requirement were thus satisfied. Under these circumstances, we conclude that respondent's conduct in the trial court waived any defect in the notice he received. As this court noted in *Splett*, reversal of an order is not warranted based upon a procedural defect " 'that could and should have been objected to immediately, could have been easily cured if timely objected to, and made no difference anyway.' " (*Splett*, 143 Ill. 2d at 231, quoting *In re J.W.* (1981), 87 Ill. 2d 56, 62.) Moreover, even if we were to consider the defect in notice of which respondent complains, we would find it to have been harmless. Under *Splett*, since the legislative intent of section 3–611 was achieved, we will not insist on the "performance of an empty formality." (*Splett*, 143 Ill. 2d at 232.) Respondent's contention that the defect in notice was so

egregious as to warrant consideration under the "plain error" exception to the waiver rule is therefore rejected.

Accordingly, we reverse the appellate court's reversal of respondent's initial order of commitment. To the extent the appellate court decisions in *In re Long* (1990), 203 Ill. App. 3d 357, *In re Price* (1987), 152 Ill. App. 3d 960, and *In re King* (1986), 148 Ill. App. 3d 741, are inconsistent with our holding, those decisions are overruled.

## II

The State next contends that the appellate court erred in reversing the May 9, 1990, order continuing respondent's involuntary commitment. As noted, the appellate court reversed that order on the ground that the petition for continued commitment was untimely under section 3—813 of the Code (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813).

Section 3—813 provides, in pertinent part:

"An initial order for hospitalization or alternative treatment shall be for a period not to exceed 60 days. Prior to the expiration of the initial order if the facility director believes that the patient continues to be subject to involuntary admission, a new petition and 2 new certificates may be filed with the court. *** If no petition is filed prior to the expiration of the initial order, the patient shall be discharged. Following a hearing, the court may order a second period of hospitalization or alternative treatment not to exceed 60 days only if it finds that the patient continues to be subject to involuntary admission." Ill. Rev. Stat. 1989, ch. 91½, par. 3—813(a).

In this case, the initial commitment order was entered on December 11, 1989. Under section 3—813, that order expired 60 days later, on February 8, 1990. The petition for continued hospitalization was filed on February 9, 1990, the 61st day after the initial order. Respondent contends that the appellate court correctly con-

cluded that this one-day delay required the reversal of the order continuing his hospitalization. Respondent relies on several appellate court decisions which have held that the late filing of a petition for continued hospitalization renders the resulting order invalid. See *In re Hatala* (1990), 200 Ill. App. 3d 163 (petition filed one day late); *In re Walker* (1990), 200 Ill. App. 3d 159 (petition filed one day late); *In re Bloyer* (1989), 185 Ill. App. 3d 245 (petition filed three days late); *In re Vancil* (1989), 183 Ill. App. 3d 204 (petition filed eight days late).

The State asserts that respondent has waived the issue of the timeliness of the petition. We agree that, under the circumstances of this case, the untimeliness of the petition for continued hospitalization was waived by respondent. As noted earlier in this opinion, the failure to raise an issue in the trial court results in a waiver of the issue on appeal. (*Lang*, 113 Ill. 2d at 469.) Here, the record reveals that respondent failed to raise the untimeliness of the petition in the trial court.

Respondent appeared at the May 7, 1990, jury trial on the petition for continued hospitalization and was represented by counsel. Respondent's counsel participated in numerous pretrial matters over the months between the filing of the petition and the May trial. Despite this extensive involvement in the trial court proceedings, however, neither respondent nor his attorney ever objected to the timeliness of the petition at the trial court level. Moreover, no prejudice accrued to respondent as a result of the one-day delay. As the State points out, had respondent made a timely objection, the State would simply have withdrawn its petition for continued hospitalization and filed instead a petition for initial commitment.

The lack of prejudice in this situation was addressed by the appellate court in *People v. Lang* (1989), 189 Ill.

App. 3d 384. In *Lang*, as in this case, the State filed a petition for the continued involuntary hospitalization of the respondent one day late under section 3—813. The trial court found that the respondent continued to be a person subject to involuntary admission. The respondent appealed the order, claiming that the failure to timely file the petition rendered the order ineffective. *Lang*, 189 Ill. App. 3d at 387.

The *Lang* court looked to the "substance of the issue" to determine that the one-day delay did not warrant reversal of the continued hospitalization order. The court first noted that section 3—813 provides that "the provisions of this chapter which apply whenever an initial order is sought shall apply whenever an additional period of treatment is sought." (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813(b).) The court also noted that "[t]he same substantive evidence must be presented to sustain an involuntary hospitalization," whether it be an initial period of treatment or an additional period of treatment. (Emphasis omitted.) (*Lang*, 189 Ill. App. 3d at 388.) Accordingly, the court concluded, it was insignificant whether the petition under which the respondent was committed was labeled as an initial petition or as an additional petition. *Lang*, 189 Ill. App. 3d at 388.

The obvious purpose behind section 3—813 is to prevent patient neglect and to ensure that an involuntarily committed patient's eligibility for commitment is reevaluated at regular intervals. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813; see also *In re Murphy* (1991), 214 Ill. App. 3d 8, 13-14.) This purpose was not frustrated by the one-day delay in this case. Respondent received a full hearing before a jury on the issue of his continued eligibility for involuntary admission. The jury found that respondent continued to be subject to involuntary commitment. The same substantive evidence that supported respondent's eligibility for continued commitment would have

supported his admission under an initial petition. Thus whether the petition was filed as an initial petition or as a petition for continued commitment, respondent's eligibility for commitment was evaluated under the proper standard. This is not a case in which an involuntarily committed patient was neglected by the system. In light of the fact that respondent raised no timeliness objection in the trial court and was not prejudiced by the late filing, we conclude that he waived the untimeliness of the petition for continued hospitalization. The appellate court erred in reversing the May 9, 1990, order continuing respondent's hospitalization.

### III

Respondent raises additional issues by way of cross-appeal. Respondent first argues that the trial court erred in allowing evidence and argument regarding Dennis Gerken's death to be presented at each of respondent's commitment hearings. The appellate court rejected this contention of error. 209 Ill. App. 3d at 812.

As noted, respondent was acquitted of the murder of Dennis Gerken at a discharge hearing in May 1989. At the December 1989 hearing on the initial petition for respondent's commitment, the State, in its closing argument, referred to Dennis' death and respondent's inculpatory statements, and argued that respondent murdered Dennis. In addition, the trial court, in delivering its ruling on the initial petition, stated that it considered evidence that respondent killed Dennis.

At the May 1990 trial on the petition to continue respondent's commitment, the State argued, during both its opening and its closing arguments, that respondent killed Dennis Gerken. Also at that trial, Lieutenant Iwan was allowed to testify regarding his theory of how respondent committed the murder.

Respondent contends that his acquittal on the murder charge collaterally estopped the State from presenting evidence or arguing, at the commitment hearings, that respondent killed Dennis Gerken. We disagree.

Collateral estoppel acts to bar the retrial of an issue that has been fairly and completely resolved in a prior proceeding. (*People v. Moore* (1990), 138 Ill. 2d 162, 166.) The doctrine applies if (1) the issue decided in the prior adjudication is identical with the one presented in the current suit; (2) the prior suit was terminated with a final judgment on the merits; and (3) the party against whom the estoppel is asserted was a party or in privity with a party in the prior suit. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1979), 78 Ill. 2d 1, 7.) Here, the parties do not dispute that the prior suit was terminated with a final judgment on the merits and that the party against whom the estoppel is asserted, the State, was a party to the prior suit. Thus, we must determine whether the issue decided in the prior adjudication is identical to that presented in the current proceeding.

The United States Supreme Court recently addressed this question in *Dowling v. United States* (1990), 493 U.S. 342, 107 L. Ed. 2d 708, 110 S. Ct. 668. In *Dowling*, during the defendant's trial on robbery charges, the State introduced the testimony of a witness who identified the defendant as the perpetrator of an unrelated robbery. The defendant had previously been acquitted of that particular robbery charge. *Dowling*, 493 U.S. at 344-45, 107 L. Ed. 2d at 715, 110 S. Ct. at 670.

The defendant argued that his acquittal collaterally estopped the prosecution from introducing the disputed testimony. The Supreme Court held, however, that collateral estoppel was inapplicable. The Court determined that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is

presented in a subsequent action governed by a lower standard of proof." (*Dowling*, 493 U.S. at 349, 107 L. Ed. 2d at 718, 110 S. Ct. at 672.) The *Dowling* Court reasoned that the defendant's prior acquittal proved only that a reasonable doubt existed as to the defendant's guilt of the first robbery. At the second robbery trial, the government sought to use the testimony regarding the first robbery *as evidence* of the defendant's guilt of the second robbery. The *Dowling* Court noted that the standard for admitting "similar acts" evidence, under the Federal Rules of Evidence, is whether the jury can reasonably conclude that the act occurred and that the defendant was the actor. (*Dowling*, 493 U.S. at 348, 107 L. Ed. 2d at 718, 110 S. Ct. at 672.) Because the standard of proof for introducing the first robbery *as evidence* at the second robbery trial was lower than beyond a reasonable doubt, the government was not precluded from relitigating, at the second trial, the issue of the defendant's participation in the first robbery. (*Dowling*, 493 U.S. at 348-49, 107 L. Ed. 2d at 718, 110 S. Ct. at 672.) The prior acquittal did not resolve the identical question presented in the second robbery trial. Accordingly, collateral estoppel did not bar the admission of the disputed testimony at the second robbery trial. *Dowling*, 493 U.S. at 348, 107 L. Ed. 2d at 717-18, 110 S. Ct. at 672.

The *Dowling* Court noted that this rule also applies where a criminal acquittal is followed by a civil action involving the same issue. The Court referred to its previous holdings that an acquittal in a criminal action does not bar the government from relitigating, in a civil action, the defendant's commission of the charged wrongdoing because " 'the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel.' " *Dowling*, 493 U.S. at 349, 107 L. Ed. 2d at 718, 110 S. Ct. at 673, quoting *One Lot Emerald Cut Stones v. United States* (1972),

409 U.S. 232, 235, 34 L. Ed. 2d 438, 442, 93 S. Ct. 489, 492.

This court applied the reasoning of *Dowling* in *People v. Jackson* (1992), 149 Ill. 2d 540. In *Jackson*, we held that an acquittal on a criminal charge did not preclude the State from introducing evidence that the defendant committed that offense at the defendant's sentencing hearing on another crime. We reasoned that an acquittal means only that the government was unable to prove beyond a reasonable doubt that the defendant committed the charged acts. Therefore, we concluded, "there is no reason to exclude consideration of the underlying facts *** where the burden of proof is lower." *Jackson*, 149 Ill. 2d at 550.

We find that *Jackson* and *Dowling* are dispositive of the issue now before us. Respondent was acquitted of Dennis Gerken's murder at a discharge hearing where the burden of proof was beyond a reasonable doubt. (See Ill. Rev. Stat. 1989, ch. 38, par. 104—25(b).) Thus, his acquittal established only that the State was unable to prove his commission of the crime beyond a reasonable doubt. At respondent's *civil* commitment hearings, the State was not required to prove beyond a reasonable doubt that respondent murdered Dennis Gerken. Rather, the State sought merely to use the testimony regarding respondent's participation in Dennis'. murder *as evidence* of respondent's eligibility for involuntary admission. The State's only burden, at the commitment hearings, was to establish, by clear and convincing evidence, that respondent was a person subject to involuntary admission. (See Ill. Rev. Stat. 1989, ch. 91½, par. 3—808.) The trial court did *not* have to find beyond a reasonable doubt that respondent murdered Dennis; in fact, the trial court did not have to find by *any* standard of proof that respondent murdered Dennis in order to find him subject to involuntary admission. Thus, respondent's acquittal

did not resolve the question presented at the commitment hearings. Under *Dowling* and *Jackson*, the trial court could properly consider evidence regarding respondent's possible commission of Dennis Gerken's murder as evidence of his eligibility for commitment.

Respondent relies upon *People v. Grayson* (1974), 58 Ill. 2d 260, as support for his claim that the evidence was improperly considered. In that case, the defendant, while on probation, was tried and acquitted of an armed robbery charge. The State thereafter petitioned for the revocation of the defendant's probation based upon his commission of the same armed robbery. The trial court revoked the defendant's probation. On appeal to this court, the defendant argued that the prior acquittal collaterally estopped the State from relitigating the issue of the defendant's commission of the armed robbery. *Grayson*, 58 Ill. 2d at 262.

The *Grayson* court acknowledged that, at a criminal trial, the State must prove the defendant guilty beyond a reasonable doubt, while at a probation revocation hearing, the State need only prove the probation violation by a preponderance of the evidence. (*Grayson*, 58 Ill. 2d at 264.) However, the court concluded that the difference in the burdens of proof did not preclude the application of collateral estoppel. Relying on the "criminal nature" of probation revocation proceedings, the court determined that the defendant's acquittal of the armed robbery charge at a criminal trial precluded the State from seeking to prove that the defendant committed that robbery in order to revoke his probation. *Grayson*, 58 Ill. 2d at 265.

In the instant case, we are concerned only with whether an acquittal on a criminal charge precludes the use of evidence of that crime at a subsequent civil commitment hearing. We have determined that, under *Jackson* and *Dowling*, this subsequent use of the evidence

was proper. While we question the viability of *Grayson* in light of *Jackson*, we are not now presented with the specific question addressed in *Grayson*: whether a crime of which a defendant has been acquitted may nonetheless constitute the basis for a probation revocation. Thus, we will not herein decide whether *Grayson* remains valid today. However, we do determine that *Jackson*, and not *Grayson*, controls the instant case.

We therefore hold that respondent's acquittal of Dennis Gerken's murder did not collaterally estop the State from introducing evidence of Dennis' murder at respondent's civil commitment hearings.

### IV

Respondent also contends that the trial court erred in admitting, at both of his commitment hearings, the inculpatory statements he made to Lieutenant Iwan on August 8 and 9, 1984, regarding Dennis Gerken's murder. Respondent asserts that the trial court was required to hold a hearing on the voluntariness of the statements prior to admitting them. The appellate court rejected respondent's argument, holding that the statements were properly admitted. 209 Ill. App. 3d at 810.

Prior to each of his commitment hearings, respondent filed a motion *in limine* to exclude any and all statements made by him in connection with the 1984 murder charge. As noted, respondent made several inculpatory statements to Lieutenant Iwan. Respondent told Iwan that he took Dennis outside on the evening of August 8, 1984; that, while outside, Dennis turned into an animal; and that respondent struck the animal with an axe and buried it. These statements were suppressed at respondent's discharge hearing because it was determined that respondent's insanity at the time of the statements precluded a knowing and meaningful waiver of his *Miranda* rights. (See *People v. Nau* (1988), 167 Ill. App. 3d 338

(affirming the suppression order).) The respondent's motions *in limine* to exclude these statements at his commitment hearings were denied.

Respondent argues that the trial court erred in admitting the statements without first conducting a hearing on their voluntariness. Respondent asserts that such a hearing is required at a criminal trial when an objection is made to a confession's admissibility. Respondent acknowledges that commitment proceedings under the Mental Health Code are civil, not criminal, in nature. Respondent nevertheless argues that this court's decision in *People v. Capoldi* (1957), 10 Ill. 2d 261, requires that the trial court hold a hearing on the voluntariness of a statement prior to admitting it at a civil commitment hearing. *Capoldi* held that such a hearing was required when the State seeks to admit a confession at a hearing under the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1955, ch. 38, pars. 820.01 through 825e (now Ill. Rev. Stat. 1989, ch. 38, par. 105–1.01 *et seq.*)). The appellate court below rejected this contention, finding that *Capoldi* is distinguishable. We agree that *Capoldi* is distinguishable.

As stated, *Capoldi* addressed proceedings under the Sexually Dangerous Persons Act. As the appellate court herein noted, there are substantial differences between proceedings under that Act and involuntary commitment proceedings under the Mental Health Code. Petitions for confinement under the Sexually Dangerous Persons Act are to be filed "[w]hen any person is *charged with a criminal offense* and it shall appear \*\*\* to the State's Attorney of the county wherein such person is so charged, that such person is a sexually dangerous person." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 105–3.) A petition for commitment under the Mental Health Code does not have to be preceded by a criminal charge. Moreover, proof that a person is sexually dangerous must be beyond a reasonable doubt. (Ill. Rev.

Stat. 1989, ch. 38, par. 105—3.01.) The standard of proof in proceedings under the Mental Health Code, on the other hand, is clear and convincing evidence. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—808.) Persons found to be sexually dangerous are committed to the custody of the Director of Corrections as guardian. (Ill. Rev. Stat. 1989, ch. 38, par. 105—8.) Persons involuntarily committed under the Mental Health Code may be committed to a mental health facility, private hospital, United States Veterans Administration facility, or the care and custody of a relative or other person willing and able to properly care for him or her. Ill. Rev. Stat. 1989, ch. 91½, par. 3—811.

This court has previously recognized that there is a substantial distinction between proceedings under these two acts. In *People v. Pembrock* (1976), 62 Ill. 2d 317, this court stated:

> "A 'sexually dangerous person' creates different societal problems, and his past conduct is different in degree and kind from the conduct of persons in the larger, more inclusive class defined under the Mental Health Code. The defendant has failed to show why, in light of these factors, the legislature is not justified in prescribing a different manner of treatment. As noted earlier, 'society has a substantial interest in the protection of its members from dangerous deviant sexual behavior.' " *Pembroke*, 62 Ill. 2d at 322, quoting *United States ex rel. Stachulak v. Coughlin* (7th Cir. 1975), 520 F.2d 931, 937.

We agree with the appellate court in the case at bar that "[p]roceedings under the Sexually Dangerous Persons Act are much more closely tied to criminal actions and proceedings than are those under the Mental Health Code." (209 Ill. App. 3d at 810.) Notably, even though sexually dangerous persons proceedings are closely tied to criminal proceedings, this court has held that not all criminal procedural safeguards need be applied. (See

*People v. Allen* (1985), 107 Ill. 2d 91, 100, *aff'd* (1986), 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (holding that the privilege against self-incrimination does not apply to sexually dangerous persons proceedings).) We therefore conclude that involuntary commitment proceedings under the Mental Health Code are sufficiently different from criminal proceedings and those under the Sexually Dangerous Persons Act as to distinguish and make inappropriate the adoption of the *Capoldi* requirement of a preliminary hearing on voluntariness.

Accordingly, we hold that the trial court did not err in admitting respondent's inculpatory statements regarding Dennis Gerken's murder.

## V

For the foregoing reasons, we reverse the appellate court's judgment, which reversed the December 11, 1989, order directing respondent's initial involuntary commitment and the May 9, 1990, order continuing respondent's involuntary commitment. The judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE FREEMAN concurring in part and dissenting in part:

I disagree with part II of the majority's opinion. There, the majority concludes that respondent waived the opportunity to argue the untimeliness of the State's petition for continued hospitalization or alternative treatment. (153 Ill. 2d at 420-21.) The majority nevertheless concludes that the late filing of the petition was harmless. (153 Ill. 2d at 421.) Those conclusions, I believe, are flawed. Therefore, I dissent.

Waiver, as relied upon by the majority in part II, cannot apply here. Section 3—813 of the Code mandates dis-

charge of a patient if a petition for continued hospitalization or alternative treatment is not filed before expiration of the initial order of involuntary admission. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813.) Either the section operates to discharge a patient if such a petition is not filed, or it does not. In either event, the outcome is independent of respondent's conduct. The result of an untimely petition is directed by statute. Whether or not respondent directed attention by objection to what is statutorily mandated is immaterial. See *Cuny v. Annunzio* (1952), 411 Ill. 613, 617 (holding that express statutory requirements rendered it immaterial that no objections were made regarding naming certain parties as defendants in administrative review proceedings).

More troubling is the conclusion that the State's late filing of the petition was harmless. The majority acknowledges, without comment, four decisions in which the appellate court held similarly late petitions invalid. (153 Ill. 2d at 421, citing *In re Hatala* (1990), 200 Ill. App. 3d 163; *In re Walker* (1990), 200 Ill. App. 3d 159; *In re Bloyer* (1989), 185 Ill. App. 3d 245; *In re Vancil* (1989), 183 Ill. App. 3d 204.) Two of those cases, *Hatala* and *Walker*, involved late filings of a single day. The majority fails to distinguish the four decisions or the reasoning underlying the holdings.

Instead, the majority finds support in *People v. Lang* (1989), 189 Ill. App. 3d 384, to apply an analysis which considers the prejudice resulting from the State's late filing. I believe the rationale underlying *Lang* is suspect. More importantly, as with the majority's application of waiver, reliance on *Lang* to reach the conclusion that respondent was not prejudiced results in ignoring the Code's plain language.

*Lang*, like *Hatala*, *Walker* and this case, involved a petition which was filed one day after the expiration of a preceding order of involuntary admission. The focus of

attention in *Lang* was a tenth consecutive petition filed by the State. That petition, like that preceding it, sought an additional 180-day period of treatment pursuant to section 3—813(b) of the Code. The appellate court declined to dismiss the tenth petition even though the State had filed it on the 181st day following a ninth order of additional treatment for 180 days. The court did not directly address the petition's untimeliness—a curious fact given that the court expressly identified that as the issue presented. (*Lang*, 189 Ill. App. 3d at 388.) Instead, the court simply noted that petitions for additional periods of treatment under section 3—813(b) were subject to the same procedures governing initial petitions. (*Lang*, 189 Ill. App. 3d at 388.) The court justified the additional period of treatment ordered pursuant to the tenth petition in consideration of the evidence which supported the initial period of involuntary admission. *Lang*, 189 Ill. App. 3d at 388.

Upon a first reading of *Lang*, the support the majority finds for its holding in part II appears weak given that the untimeliness issue is not directly addressed. A closer examination shows that that support is not weak, it is illusory.

The appellate court misapprehended section 3—813(b), the basis for its decision. Section 3—813(b) permits additional 180-day periods of treatment to be sought "so long as the patient continues to be subject to involuntary admission." (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813(b).) But, as pointed out above, section 3—813(a) requires the discharge of a patient if a petition for continued hospitalization or treatment is not timely filed. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—813(b).) A discharged patient cannot be "subject to involuntary admission." Discharge defeats application of section 3—813(b). The fact that section 3—813(b) incorporates the same

procedures as for initial petitions simply has no bearing on the effect of a late petition.

Certainly, the substantial liberty interests implicated in involuntary admissions procedures must be balanced against the objectives of providing care for those who are unable to care for themselves and to protect society from the dangerously mentally ill. (*In re Robinson* (1992), 151 Ill. 2d 126, 130-31.) There is no worth, however, in striking that balance at a sacrifice of adherence to the rule of law. It is too easy in cases which present facts as compelling as this one to ignore the strictures of the Code in the aim, albeit valid, of protecting society from the dangerously mentally ill. In striving to protect potential victims at the expense of enforcing what the Code mandates, the system our legislature has instituted for that protection itself falls victim.

Ironically, a careful reading of the Code reveals that provisions are available to legitimately seek to immediately reestablish a condition of involuntary admission following an untimely petition. Section 3—902 governs discharge. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—902.) Subsection (b) tracks the language of section 3—813(b) in providing that discharge follows when the patient is "no longer subject to involuntary admission." (Ill. Rev. Stat. 1989, ch. 91½, par. 3—902(b).) Subsection (d) provides that where a discharge results, the State's Attorney of the pertinent county may be promptly notified. (Ill. Rev. Stat. 1989, ch. 91½, par. 3—902(d).) Nothing in the Code prevents the State's Attorney, informed of such discharge, to then immediately seek an emergency admission by certification pursuant to sections 3—600 through 3—611 (Ill. Rev. Stat. 1989, ch. 91½, pars. 3—600 through 3—601). Section 3—601(a) permits such admission when "immediate hospitalization is necessary for the protection of *** others from physical harm." (Ill. Rev. Stat. 1989, ch. 91½, par. 601(a).) Subsequent steps

then may be taken to impose further involuntary admission in a mental health facility (see Ill. Rev. Stat. 1989, ch. 91½, pars. 3—700 through 3—706).

Some might argue that following those steps amounts to an empty exercise. Quite the contrary is true. Adherence to the procedures established by the Code is the only way to ensure that the efforts taken to subject individuals to involuntary admission in a hospital or mental health facility are properly scrutinized. And only through such adherence are the Code's goals and the liberty interests implicated in involuntary admission procedures simultaneously honored.

That said, I must point out that I do not disagree that, under certain circumstances, the State's failure to comply with the provisions of the Code may be excused where the Code's purposes are achieved. (*Robinson*, 151 Ill. 2d at 131, citing *In re Splett* (1991), 143 Ill. 2d 225.) For example, I agree with the majority's conclusion in part I of the opinion regarding non-compliance with the notice requirements of section 3—611. (153 Ill. 2d at 415-20; see also *Robinson*, 151 Ill. 2d 126.) The purpose of the Code was clearly satisfied given that the respondent had actual notice of the proceedings. (153 Ill. 2d at 419-20.) There is, however, a fundamental distinction between part I, where such analysis is proper, and part II, where it is not. Unlike the mandate of discharge upon an untimely petition for continued hospitalization or treatment, the Code does not direct the result upon noncompliance with its provisions for notice.