*In re* STEVEN LUKER, a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Steven Luker, Respondent-Appellant).

Fourth District    No. 4—93—0006

Opinion filed December 30, 1993.

368

KNECHT, J., dissenting.

John B. Lower and Jeff M. Plesko, both of Guardianship & Advocacy Commission, of Anna, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

The circuit court found respondent Steven Luker subject to involuntary commitment pursuant to section 1—119 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91½, par. 1—119). Luker appeals, contending the circuit court's order must be reversed because (1) he did not receive a copy of the petition for involuntary commitment; and either (2) the petition for involuntary commitment was filed more than 24 hours after his admission, or (3) a certificate was not completed by a psychiatrist within 24 hours after his admission. We affirm.

On December 22, 1992, Delores Luker named her son in a petition for involuntary admission. She filed the petition December 24. The petition asserted Luker was a mentally ill person who because of his illness was reasonably expected to inflict serious physical harm upon

himself or another in the near future and who was unable to provide for his basic needs so as to guard himself from serious physical harm. As a basis for these assertions, the petition alleged Luker was not oriented to person and place, exhibited flight of ideas and pressured speech, drove his car to Chicago and left it there for no reason, called deceased people and local businesses, and was not eating and taking care of his basic needs.

Luker was involuntarily admitted, on an emergency basis, to Decatur Memorial Hospital on either December 22 or December 24, 1992. Two certificates, one signed by a psychiatrist and the other by an emergency room physician, were filed December 24. The psychiatrist examined Luker at an unspecified facility on December 23, while the emergency room physician examined Luker December 22 at Decatur Memorial Hospital. Both doctors' signatures were illegible.

On December 29, 1992, a hearing was held on the petition for involuntary admission. The court granted the public defender's request to waive Luker's presence, and then heard testimony from Dr. Raul Puertollano, a psychiatrist at Decatur Memorial Hospital. Puertollano stated he first examined Luker on the date of his admission, which was recorded on Puertollano's chart as December 24, and he had seen Luker almost every day since. Luker had a prior history of hospitalization. Based on symptoms including pressure of speech, flight of ideas, and continual interruption of staff members, Luker was initially diagnosed as psychotic. However, this diagnosis was changed to bipolar disorder, manic type, upon further evaluation. Puertollano testified his main concern was Luker's ability to take care of himself, given Luker's refusal to take prescribed medication and his act of driving his car to Chicago and leaving it in a towing yard to accumulate fines. Puertollano indicated Luker's prognosis was poor without treatment and gave his opinion that long-term treatment was necessary. Voluntary hospitalization was not an option because Luker had been offered voluntary admission several times and refused. Luker's condition had once deteriorated to the point that he had to be secluded, but Puertollano found no other evidence of violent or aggressive behavior. According to Puertollano, Luker's disorder was disruptive and precluded him from a less than full-time hospitalization.

Delores Luker testified she filed the petition for involuntary admission because her son had been calling her, attempting to disguise his voice, and asking for information about various people. When Delores confronted Luker about the calls, he informed her he was running a business and had to "check on" these people. Luker had spent four years at the University of Illinois and studied at two European

institutions, but he had never received a degree. Although Luker had been out of school for two years, he had not been employed and Delores was unaware of any attempts to find employment. Delores set January 1, 1992, as the date on which Luker was to move out of her house; since then, Luker had been living alone in an apartment with two inches of papers covering the floors. Although Delores had expressed her concern over the possibility of a fire and provided some furniture for her son, he slept on a sleeping bag on top of the papers and insisted he was not a housekeeper. Luker spent his Social Security funds the first week of every month and then asked his mother and his neighbors for food for the remainder of the month. Luker never threatened Delores or any other family members in her presence, but on one occasion he showed Delores his penis and wanted her to feel it. Delores stated that Luker's "disguised voice" phone calls, calls requesting food, calls asking to speak to his deceased grandmother, refusal to open his mail and failure to pay his credit card bills, bizarre phone calls from Canada, and refusal to remain on medication once released from hospitalization all prompted her to file the petition.

The court stated a *prima facie* case had been made, and reasserted that finding after Phil Luker, Luker's brother, indicated his testimony would essentially duplicate his mother's. The court found Luker was mentally ill and unable to provide for his basic physical needs so as to guard himself from harm. The public defender waived any statement or closing. The court then ordered Luker hospitalized in the Department of Mental Health and Developmental Disabilities for a period not to exceed 180 days. This appeal follov. ed.

■ We first address Luker's argument that the circuit court's order must be reversed because he did not receive a copy of the petition for involuntary commitment. No proof of service was filed in this case. Section 3—609 of the Code provides that within 12 hours after his admission a respondent shall be given a copy of his petition. (Ill. Rev. Stat. 1991, ch. 91½, par. 3—609.) Section 3—611 of the Code then provides that within 24 hours after admission a proof of service of the petition shall be filed with the court. (Ill. Rev. Stat. 1991, ch. 91½, par. 3—611.) Those things should certainly be done, but we find nothing in the Code which would indicate that the failure to do them renders any subsequent proceedings void. Failure to comply with section 3—609 or 3—611 might be error, but error is waived if it is not properly brought to the attention of the trial court. *In re Nau* (1992), 153 Ill. 2d 406, 417, 607 N.E.2d 134, 139; *People v. Lang* (1986), 113 Ill. 2d 407, 469, 498 N.E.2d 1105, 1134.

The purpose of the petition is to advise respondent of the proceedings which have been commenced against him in order that he may prepare evidence and argument for the hearing. Here, Luker's attorney was present at the hearing and made no suggestion to the court that she or Luker was unable to prepare his case. Parties should not be permitted to take part in a hearing on the merits and then, if they do not prevail, obtain a new hearing by complaining of a procedural defect " 'that could and should have been objected to immediately, could have been easily cured if timely objected to, and made no difference anyway.' " (*In re Splett* (1991), 143 Ill. 2d 225, 231, 572 N.E.2d 883, 886, quoting *In re J.W.* (1981), 87 Ill. 2d 56, 62, 429 N.E.2d 501, 504.) In *Splett*, the return of service portion of a notice of hearing form was left blank. The supreme court would have affirmed the order of commitment on that issue, because it was evident that respondent, who had been present at the hearing, had received actual notice of the hearing against him. (*Splett*, 143 Ill. 2d at 230-31, 572 N.E.2d at 886.) We see no reason to apply a different rule to the failure to file a proof of service of a petition.

In *Nau*, respondent was served with a notice of hearing on a petition for emergency involuntary admission, but he was served before the petition was filed—service which apparently was not contemplated by section 3—611 of the Code. The supreme court affirmed the order of commitment, citing *Splett*, on the basis that it was undisputed respondent received actual notice, neither respondent nor his counsel ever objected in the trial court, and "respondent does not assert, and the record does not indicate, that respondent was in any manner prejudiced by the fact that the notice was served before the trial court had a chance to direct it." (*Nau*, 153 Ill. 2d at 419, 607 N.E.2d at 140.) A second issue raised in *Nau* concerned the fact that the petition for continued hospitalization was filed a day late. The supreme court also found that issue waived, again stressing there was no prejudice. "[H]ad respondent made a timely objection, the State would simply have withdrawn its petition for continued hospitalization and filed instead a petition for initial commitment." (*Nau*, 153 Ill. 2d at 421, 607 N.E.2d at 141.) The same is true in this case. If the issue had been raised at trial, the State could simply have started over with a new petition for emergency admission. It may be that Luker's counsel for that reason chose not to object to the lack of a proof of service; an objection may have resulted in additional proceedings, but would not have resulted in any benefit to Luker.

■ We next address Luker's argument that either the petition was filed more than 24 hours after his admission or a psychiatrist's

certificate was not completed within 24 hours after admission. Dr. Puertollano testified that, according to his chart, Luker was admitted on December 24. However, Luker's counsel convincingly argues it would make no sense for two doctors, who examined Luker and found him subject to involuntary admission on December 22 and December 23, to then release him from the hospital and let him remain at large until his December 24 admission. Accordingly, we assume Luker was admitted on December 22, the date Delores Luker executed the petition for involuntary admission. Given that assumption, the petition in this case should have been filed on December 23 (Ill. Rev. Stat. 1991, ch. 91½, par. 3—611), but was filed on December 24. Under *Nau*, any objection to the late filing was waived by Luker's failure to object in the trial court. *Nau*, 153 Ill. 2d at 417, 607 N.E.2d at 139.

Section 3—610 of the Code requires that a psychiatrist examine Luker "[a]s soon as possible but not later than 24 hours" after admission. (Ill. Rev. Stat. 1991, ch. 91½, par. 3—610.) Section 3—610 goes on to direct that "[i]f the respondent is not examined or if the psychiatrist does not execute a certificate pursuant to Section 3—602, the respondent shall be released forthwith." (Ill. Rev. Stat. 1991, ch. 91½, par. 3—610.) Again assuming that Luker was admitted on December 22, this is not a case where the respondent was not examined, or where the psychiatrist did not execute a certificate. Luker was examined by a psychiatrist on December 23. On the basis of the record before us we cannot say the examination and certificate were not accomplished within 24 hours.

Even if Luker was admitted on December 24, and that admission followed the examination on December 23, the language of section 3—610 of the Code indicates the legislature intended that the psychiatric examination be done as soon as possible. The reference to 24 hours "after admission" only sets the outside limit for examination (Ill. Rev. Stat. 1991, ch. 91½, par. 3—610); if Luker could be examined before admission, so much the better. In the language of *Nau*, "respondent does not assert, and the record does not indicate, that respondent was in any manner prejudiced by the fact" that the second examination took place before admission, assuming that is a fact. *Nau*, 153 Ill. 2d at 419, 607 N.E.2d at 140.

■ In article VI, the legislature has set out a complicated method of providing various notices to respondents, their attorneys, guardians and other persons. With one exception, however, the legislature has not indicated that a failure to comply with its provisions should deprive a court of the authority to proceed with the case. That exception is where the respondent is not examined or where the psychia-

trist does not execute a certificate. As discussed above, that exception does not apply here. "This is not a case in which an involuntarily committed patient was neglected by the system." *Nau*, 153 Ill. 2d at 423, 607 N.E.2d at 142.

For the foregoing reasons, the judgment of the circuit court of Macon County is affirmed.

Affirmed.

LUND, J., concurs.

JUSTICE KNECHT, dissenting:

Errors and procedural irregularities that would not be tolerated in other civil litigation and in criminal proceedings are often overlooked in mental health cases. When the State points the finger at a person and says you are mentally ill and we want to involuntarily confine you, the State should be required to follow the rules.

The failure to follow statutory procedures does not *automatically* invalidate an order of commitment. (*In re Nau* (1992), 153 Ill. 2d 406, 419-20, 607 N.E.2d 134, 140-41; *In re Splett* (1991), 143 Ill. 2d 225, 230-31, 572 N.E.2d 883, 885-86.) However, *Nau* and *Splett* should not be read to permit the State to only follow those statutory mandates it pleases.

The hospital failed to comply with its statutory duty to file proof of service of the petition for involuntary commitment with the court. There is no evidence in this record respondent was provided with a copy of the petition within 12 hours of his involuntary admission. Both *Nau* and *Splett* involved, in part, notice of *hearings* about which the respondent had actual notice, not the failure to provide respondent with a copy of the petition which alleges he should be deprived of his liberty.

We are unable to discern from this record whether respondent was admitted on December 22 or December 24. We do not know who the psychiatrist was who examined respondent on December 23. If respondent was admitted on December 22, the petition in order to be timely should have been filed on December 23. It was not. If respondent was admitted on December 24, then he should have been examined by a psychiatrist within 24 hours of admission. He was not.

The majority concludes that if respondent could be examined by a psychiatrist and a certificate executed before admission, so much the better. Section 3—610 of the Code specifically provides for this examination *after* involuntary admission. (Ill. Rev. Stat. 1991, ch. 91½, par.

3—610.) The first certificate under section 3—602 of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—602) must be completed within 72 hours *prior* to involuntary admission. The second certificate, under section 3—610, is required to be executed by a psychiatrist upon examination of the respondent within 24 hours *after* his involuntary admission.

Section 3—610 provides a three-fold safeguard. The second examiner must be a psychiatrist, must not be the same person who executed the first certificate and must examine the respondent *after* admission. The legislature could not have been more specific. The mental health and condition of an individual is not static. The respondent who is in need of involuntary admission on day one may not be in the same condition on day four *after* admission. It is not better to ignore the statute and provide a second examination and certificate prematurely. The time line established by the legislature should be followed.

Respondent was not provided with a copy of the petition for involuntary admission. The petition itself was not timely filed, or, in the alternative, respondent was not examined by a psychiatrist within 24 hours after admission. These mistakes are not harmless and they are apparent on the face of the record. I would reverse.